55 Mass. App. Ct. 715 (2002)                    715

Liquor Liability Joint Underwriting Association of Massachusetts *v.* AIM Insurance Agency.

# LIQUOR LIABILITY JOINT UNDERWRITING ASSOCIATION OF MASSACHUSETTS *vs.* AIM INSURANCE AGENCY.

No. 99-P-919.

Norfolk. October 4, 2001. - September 6, 2002.

Present: BROWN, CYPHER, & KAFKER, JJ.

*Insurance,* Liquor liability insurance, Misrepresentation, Broker. *Broker,* Insurance. *Consumer Protection Act,* Insurance.

In an action by the Liquor Liability Joint Underwriting Association (LLJUA) against an insurance broker claiming that its insured was not qualified to obtain coverage from LLJUA above minimum limits because the insured did not have sufficient general liability insurance for its premises (a condition for expanded coverage) and that the broker was liable for misrepresentation and a violation of G. L. c. 93A, the judge did not err in concluding that the broker neither made any falsehood nor acted in violation of c. 93A, where the insured's application accurately described the terms of the underlying general liability policy and LLJUA's servicing carrier, in verifying the information on the application, failed to notice a reference to the exclusion of the insured's property, and where the record did not warrant a finding that the broker had uttered a half truth or a partial disclosure of the kind for which liability could be imposed. [720-723]

CIVIL ACTION commenced in the Superior Court Department on March 31, 1992.

The case was heard by *Elizabeth Butler,* J.

*Steven L. Schreckinger* for the plaintiff.

*Jerry E. Benezra* for the defendant.

BROWN, J. This appeal concerns a liquor liability insurance policy written by the Liquor Liability Joint Underwriting Association of Massachusetts (LLJUA) for its insured, Quincy Motel Corporation (QMC). That policy provided the maximum amount of liquor liability coverage — $500,000 per claimant/$1 million per occurrence — and insured QMC's Aquarius Lounge located in Quincy.

After substantial dram shop claims had been made against

that policy, the LLJUA commenced this action against QMC, claiming QMC was not qualified to obtain $500,000/$1 million coverage because it did not have an equivalent amount of general liability insurance for the insured premises.[1] As stated in the LLJUA application form, this was a condition to obtain insurance coverage above the $100,000/$200,000 minimum limits from the LLJUA. QMC and its insurance broker, AIM Insurance Agency, Inc. (AIM), had jointly prepared the application form in requesting insurance from the LLJUA. By impleader, AIM found itself on the receiving end of claims by the LLJUA alleging misrepresentation and a violation of G. L. c. 93A.[2]

After a jury-waived trial, a Superior Court judge made detailed findings of fact and concluded that AIM had neither made any false statement nor acted in violation of c. 93A. We affirm the Superior Court judgment.

1. *Background.*[3] The LLJUA was created by St. 1985, c. 223, to provide liquor liability insurance to sellers and distributors of alcohol who are unable to purchase insurance in the open market. See *Liquor Liab. Joint Underwriting Assn. of Mass.* v. *Hermitage Ins. Co.*, 419 Mass. 316, 318 & n.1 (1995); *Bolden* v. *O'Connor Café of Worcester, Inc.*, 50 Mass. App. Ct. 56, 57 n.3 (2000). An LLJUA policy guards only against the specific risk of an insured's negligent distribution, sale or service of alcohol,[4] and such coverage shall not "exceed five hundred thousand dollars for each claimant under one policy and one million dollars for all claimants under one policy in any one cause of action." St. 1985, c. 223, § 3. See *Jimmy's Diner, Inc.* v. *Liquor Liab. Joint Underwriting Assn. of Mass.*, 410 Mass.

---

[1]Among its other allegations, the LLJUA asserted that QMC had knowingly misrepresented its general liability coverage in the application.

[2]Those claims, in essence, reduced to whether AIM had represented, expressly or impliedly, to the LLJUA that there was in place, in 1989, general liability insurance coverage (with a $1 million limit) on the Aquarius Lounge.

[3]Though they stipulated to many of the underlying material facts, the parties diverged sharply as to the conclusions to be drawn from those facts.

[4]"It is a specific risk policy, designed by the Legislature to provide such establishments with coverage against liability imposed because alcohol was negligently given to an individual with resulting injury for which damages are sought." *Jimmy's Diner, Inc.* v. *Liquor Liab. Joint Underwriting Assn. of Mass.*, 410 Mass. 61, 65 (1991).

61, 64 (1991). Applicants for LLJUA insurance are required to complete its application form.

a. *Application.* Aspects of the LLJUA's application pertinent to this dispute are as follows. On the second page of the application form, § 3.B ("Policy Limits Requested") expressly provides that:

> "You [i.e., applicant] may not purchase liquor liability insurance from the [LLJUA] with policy limits greater than your general liability limits (including applicable umbrella and excess coverage) for the premises sought to be insured, except that if your general liability policy limits fall below or between the limits offered by the [LLJUA], you may purchase the next highest liquor liability limits (i.e., if you have $200,000 per person/$400,000 per occurrence general liability limits, you may purchase $250,000/$500,000 liquor liability limits; if you have no general liability coverage or less than $100,000/$200,000 per occurrence, you may still purchase the $100,000/$200,000 liquor liability limits.)"

An applicant may identify the limits of its general liability insurance by answering question 3.B.1., which provides as follows:

> "State the general liability insurance limits of coverage for the premises sought to be insured, including umbrella and excess liability:
>
> "$_____ per person        $_____ per occurrence
> "$_____aggregate          $_____ umbrella or excess"

Here, QMC's application, as submitted by AIM, did not furnish any response whatsoever to question 3.B.1; it was simply left blank.

QMC and AIM furnished a binder[5] for a general liability insurance policy that had been issued to QMC. The binder, which consists of a single page, disclosed that the general liability policy had been written by "United National Company"

---

[5]Though the application form does not refer to a binder, the parties stipulated that an insurance binder was an acceptable substitute for a declarations page.

(United) with a liability limit of $1 million, and that the "insured" was "Quincy Bay Inn DBA, Quincy House Corp., Quincy Motel Corp., Aquarius Lounge, Emerald City Realty Trust, 29 Hancock Street, Quincy, MA 02171." ·

In a section titled "Special Conditions/Restrictions/Other Coverages," the binder provides (in block type) as follows:

> "LIMIT OF LIABILITY — $1,000,000. CSL — OWN-ERS, LANDLORDS AND TENANTS 1973 OCCUR-RENCE FORM — DEDUCTIBLE $5,000. *EXCLUDE* — ASBESTOS, POLLUTION, PUNITIVE DAMAGES, ANIMALS, WATER DAMAGE, LEAD PAINT POISON, ASSAULT AND BATTERY, SEXUAL ASSAULT, *LOUNGE & NIGHTCLUB.*

> "WARRANT CERTIFICATES OF INSURANCE FOR RESTAURANT $500,000. PREMIUM — $32,500.00 — TERM — 12/10/88 — 12/10/89." (Emphases added.)

There was affixed to the binder a handwritten notation: "GENERAL LIABILITY BINDER FOR THE CURRENT YEAR." (It is not disputed that the binder accurately reflected the terms of the general liability insurance policy issued by United to QMC.)

The premium calculation performed by AIM was based on a rate applicable only to a policy with $500,000/$1 million coverage. The LLJUA was free to change the premium if it determined the applicant did not qualify for the requested coverage.

The AIM employee who assisted in the preparation of QMC's application was Jacqueline Cournoyer.[6] Significantly, the judge found that neither Cournoyer, nor any other AIM employee, had looked into QMC's general liability coverage prior to submitting the application to the LLJUA. That application was received

---

[6]The judge found that "there is a custom and practice that the agent [i.e., AIM] assists the insured if there are questions concerning items in the section requiring information from the applicant; that the agent fills out the information in the Agent or Brokers Section of the application; and that the agent fills in the information relating to premium calculations which appears on the page after the Agent or Brokers section." The application was submitted by AIM, on behalf of QMC, to the LLJUA in January of 1989. On QMC's behalf, Kenan Nacar, a company vice-president, also signed the application.

by the LLJUA in January of 1989. Its servicing carrier, Alexsis, Inc. (Alexsis), was the entity responsible for verifying information contained in the application or documents submitted therewith. Underwriting guidelines or standards, established by the LLJUA, were in place for Alexsis to follow in the process of reviewing applications for insurance.[7]

b. *LLJUA's underwriting guidelines and issuance of policy.* As was described by LLJUA's executive director, Charles Bucke, in his trial testimony, the guidelines direct the servicing carrier to verify the information contained on an application, and to confirm that requested limits of liability correspond with the general liability limits that the risk carries. The guidelines also direct the servicing carrier to contact an agent or broker in the event that an application had not been completed correctly or was lacking information; and, if there were "major" omissions, the servicing carrier was authorized to decline coverage and return the application to the applicant.[8]

Here, it is undisputed that no one, on behalf of Alexsis or the LLJUA, made any inquiry at all of AIM prior to the issuance of the 1989 policy to QMC. The Alexsis employee responsible for reviewing the QMC application for completeness did not notice either the omission of general liability limits, as asked by question 3.B.1, or the exclusion of the lounge and nightclub on the binder for the general liability insurance. That employee made a decision to process QMC's application with the information that had been provided, without making inquiry, and, as the judge found, "probably without even reading the binder because of her work load and lack of support." The judge also found that had the Alexsis employee "read the binder at the time . . . she would not have relied upon it to write the requested limits." The "mistake" in issuing a $500,000/$1 million liquor liability policy was apparently discovered by the LLJUA only after claims had been made against QMC by representatives of two minors who died in an automobile crash after having been

---

[7]Although it figures prominently in the events at issue, Alexsis was not named as a party to this lawsuit.

[8]There was evidence to the effect that it is common for an insurance agent or broker to field inquiries from either the LLJUA or other insurance company underwriters.

served alcohol at the Aquarius Lounge. The LLJUA settled those claims, one of which had been reduced to a judgment, without prejudice to its right to seek recovery from QMC (or AIM) for the loss it had sustained by having to pay monies above and beyond the minimum $100,000/$200,000 policy limit.[9]

2. *Misrepresentation.* There was ample evidence for the judge to find that the binder accurately described the terms of the underlying general liability insurance policy, and that Alexsis, in processing QMC's application, had failed to notice the binder's reference to the exclusion of the nightclub and lounge. This is the crux of the case. Though it might be said, as the LLJUA did allege, that AIM impliedly represented that QMC was qualified for the maximum coverage, such a view of the evidence is contrary to the judge's express findings, which state:

> "There was no testimony or exhibits [*sic*] offered by the LLJUA to warrant a finding that Jackie Cournoyer, or anyone else at AIM, made that misrepresentation. The only evidence of what Quincy Motel represented the coverage to be in its application is in the binder Quincy Motel provided. That binder makes no such statement. It states that the nightclub and lounge are excluded."

Since the judge reached this conclusion based on trial testimony and the documentary evidence presented, we cannot say, with any firm conviction, she was mistaken.[10]

---

[9]In defense of those claims, the LLJUA initially took the position that it would only provide coverage of $100,000 per person and $200,000 per occurrence. The LLJUA subsequently changed course, reserving its rights, by paying monies in excess of the $100,000/$200,000 limits, which, in the end, totaled $550,000, the amount (exclusive of attorney's fees) that the LLJUA claimed as damages in this action.

[10]The judge found the "only 'statement' concerning general liability coverage was the general liability binder and that 'statement' was made only by Quincy Motel, not by AIM." The LLJUA says that AIM, not QMC, was the one who spoke. In the end, the proffered distinction is immaterial given the truth of the binder.

Similarly, the judge determined that the certification provision, immediately prior to the premium calculation, was connected solely to the applicant who

That a statement may be confusing does not render it a misrepresentation. This is not to say that AIM could "purposefully shut [its] eyes to means of information within [its] own possession and control," so as to have only that "knowledge 'which [it] cares to have.' " *Perkins* v. *Rich*, 11 Mass. App. Ct. 317, 322 (1981), quoting from *Kelley* v. *Newburyport & Amesbury Horse R.R.*, 141 Mass. 496, 498-499 (1886).[11]

The present case is unlike *St. Paul Surplus Lines Ins. Co.* v. *Feingold & Feingold Ins. Agency, Inc.*, 427 Mass. 372 (1998), where an independent insurance broker, acting on behalf of an insured, was held liable, on theories of misrepresentation and violation of c. 93A, for placing material misinformation on an insurance application. There, a jury had found that the broker knowingly made false representations of a factual nature to the insurer, with the intention or expectation that the insurer would rely on the representations. *Id.* at 374. Based on the jury's findings, the court ruled it was appropriate to impose liability on the broker, who "knew, or reasonably should have known, that disclosure of the truth would have led the insurer to reject the application." *Id.* at 377.

Our review of the record satisfies us that the trial judge properly ruled the LLJUA's evidence to be insufficient to show any misrepresentation by AIM. Even if we were to agree that the binder was ambiguous or confusing, the judge was not required to accept that premise. In the end, it was the responsibility of the LLJUA to verify that an applicant's coverage request was in line with existing general liability insurance coverage for the subject premises.[12]

In short, the LLJUA did not establish a misrepresentation, see

---

signs the application; her finding on this point, while debatable, is not clearly erroneous.

[11]"Statements made in an application for insurance are in the nature of continuing representations and speak from the time the application is accepted or the policy is issued." *Ayers* v. *Massachusetts Blue Cross, Inc.*, 4 Mass. App. Ct. 530, 536 (1976), and cases cited therein.

[12]It cannot be said, as AIM would have us believe, that there was simply an opinion, estimate, or judgment by AIM that QMC was entitled to the maximum limits.

*Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 57 (1997)[13]; G. L. c. 175, § 186,[14] within the text of QMC's application for insurance. The law in this area is well-settled. See *Daniels* v. *Hudson River Fire Ins. Co.*, 12 Cush. 416, 425 (1853) (defining "misrepresentation" and "concealment" in the insurance context); *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 654-655 (1975). It cannot be fairly said that any speech on the part of AIM hobbled the LLJUA's ability to perform its underwriting functions. Compare *Lennon* v. *John Hancock Mut. Life Ins. Co.*, 339 Mass. 37, 40-41 (1959) (applicant's misrepresentation of the absence of cancer, although innocent, was compounded by his failure to report a subsequent operation to the insurer that did increase the risk of loss); *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 9 (1982) (implied representation by bank to loan applicants that a plot plan disclosed no irregularities). Here, the combined whole of QMC's application with the copy of the binder did disclose the truth, i.e., that there was in fact no general liability insurance policy in place for the Aquarius Lounge. Since the truth was disclosed, there can be no actionable silence. Contrast, in a different context, *Yorke* v. *Taylor*, 332 Mass. 368, 373 (1955); *Urman* v. *South Boston Sav. Bank*, 424 Mass. 165, 168 (1997). As the judge implicitly found, the record does not warrant a finding that AIM had uttered a half truth or a partial disclosure of the kind for which liability can be imposed. See *Kannavos* v. *Annino*, 356 Mass. 42, 48-49 (1969); *Maxwell* v. *Ratcliffe*, 356 Mass. 560, 562 (1969); *Cole* v. *New England Mut. Life Ins. Co.*, 49 Mass. App. Ct. 296, 300 (2000); Restatement (Second) of Torts § 551(2)(b) (1977). The LLJUA (and its servicing carrier, Alexsis) had an opportunity, and the responsibility, to inquire of AIM (or QMC) respecting the information in the binder. Choosing not to do so, and, ap-

---

[13]For the proof necessary to show a negligent misrepresentation, see *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 257 (1999). See also Restatement (Second) of Torts § 552(1) comment a (1977).

[14]Section 186 provides: "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss." For interpretation, see *Barnstable County Ins. Co.* v. *Gale*, 425 Mass. 126 (1997).

parently, failing even to read the binder itself, the LLJUA cannot now complain it was misled by the binder's terms. Compare *Gishen* v. *Dura Corp.*, 362 Mass. 177, 179 (1972) ("request for clarification" by plaintiff as to commission computation made it incumbent upon defendant to disclose all material facts), with *Nei* v. *Burley*, 388 Mass. 307, 311 (1983) (buyer did not avail himself of opportunity to inquire, and, thus, seller's silence was not actionable). At worst, the binder required some care in reading its terms; on no account, however, can it be said that the binder contained a falsehood, or a half truth, which standing uncorrected by a fuller disclosure, warranted the imposition of liability. Accordingly, dismissal of the LLJUA's misrepresentation claim was not error.

3. *G. L. c. 93A.* The judge correctly ruled that the LLJUA had not proved a violation of c. 93A. The reasons supporting the trial judge's (and our) conclusion that AIM was not liable in tort for misrepresentation apply with equal force to the LLJUA's claim made under c. 93A.[15]

4. *Requests for costs.* AIM's request for double costs and damages pursuant to Mass.R.A.P. 25, as appearing in 376 Mass. 949 (1979), is denied.

*Judgment affirmed.*

---

[15]Our opinion, however, should not be construed as endorsing a broker's submission of an incomplete application with the hope that the application might slip through a crack within the LLJUA's review process. Cf. *Bernal* v. *Weitz*, 54 Mass. App. Ct. 394, 396 (2002).