QUINCY MUTUAL FIRE INSURANCE CO. *vs.* QUISSET PROPER-
TIES, INC., & others[1]; ELLEN ENGELHARDT,[2] intervener.

No. 06-P-735.

Norfolk. March 12, 2007. - May 25, 2007.

Present: GRASSO, ARMSTRONG, & VUONO, JJ.

*Insurance,* Misrepresentation, Motor vehicle personal injury protection benefits.

This court concluded that where neither a provision of a commercial automobile
  insurance policy nor a renewal application required an insured to provide
  updated information to the insurer, the insured's failure to do so was not a
  misrepresentation within the meaning of G. L. c. 175, § 186, even if the
  insured's silence increased the risk of loss to the insurer. [152-157]

CIVIL ACTION commenced in the Superior Court Department on
November 20, 2003.

The case was heard by *Patrick F. Brady,* J., on motions for
summary judgment.

*Samuel M. Furgang (Jeffrey Stern* with him) for Quisset
Properties, Inc.

*Neil Sugarman (Benjamin Zimmerman* with him) for the
intervener.

*Robert A. Curley, Jr.,* for the plaintiff.

*James T. Scamby* for Fair & Yeager Insurance Agency, Inc.

GRASSO, J. On July 26, 2003, State Police Trooper Ellen Engle-
hardt received catastrophic injuries when a 1991 Volvo driven by
William Senne, the eighteen year old son of Peter Senne, struck
her cruiser. The Volvo was owned by and registered to Quisset
Properties, Inc. (Quisset), a corporation established by Peter for

---

[1]Peter Senne, William Senne, Racing Point Ventures, Inc., and Fair & Yea-
ger Insurance Agency, Inc.

[2]By her guardian, Laura Eve Tedman.

use in one of his many businesses. Although Quisset had been dissolved involuntarily in 1999, at the time of the accident, the Volvo was still insured under a commercial automobile insurance policy issued to Quisset in 1993 by Quincy Mutual Fire Insurance Co. (Quincy) and renewed annually thereafter through its agent, Fair & Yeager Insurance Agency, Inc. (Fair & Yeager). The policy listed William as a driver of the vehicle. In this appeal, we address whether optional bodily liability coverage is available under the policy.[3]

1. *Background.* In the aftermath of the accident, Quincy sought a declaration that it had no duty to defend or indemnify Quisset, Peter, or William with respect to Englehardt's claim for personal injuries under the optional bodily injury provisions of the policy.[4] Quincy maintained that Peter's failure to notify it of Quisset's dissolution amounted to a misrepresentation of a matter that increased the risk of loss to the insurer within the meaning of G. L. c. 175, § 186.[5]

On summary judgment, a judge of the Superior Court agreed and concluded that Quincy was not liable to defend or indemnify Quisset or the Sennes.[6] The judge also granted summary judgment to Fair & Yeager on the cross claims of Quisset and Peter alleging negligence.[7] He reasoned that Peter's failure to inform

---

[3]Quincy paid Englehardt to the limit of compulsory bodily injury coverage and does not challenge that payment.

[4]Quincy also sought a declaration that it is not obligated to pay any property damage claim by the Commonwealth beyond the statutory limit of $5,000, or any collision coverage claim of Quisset.

[5]General Laws, c. 175, § 186, provides: "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."

[6]Quincy presented uncontroverted evidence that lack of corporate status increased its risk of loss because (1) the insured would not have been eligible for a commercial automobile policy; (2) commercial rates are lower than for a personal automobile policy; and (3) Quincy's underwriting guidelines limited optional bodily injury coverage for a personal automobile policy to $250,000 per person, as opposed to $1,000,000 available under a commercial policy.

[7]In defense to the action, Peter asserted that failure to notify Quincy of Quisset's dissolution was not a misrepresentation that increased Quincy's risk of loss within the statute and that the actions of Fair & Yeager bound Quincy. He also asserted a cross claim against Fair & Yeager in negligence for failing

Fair & Yeager of Quisset's dissolution rendered irrelevant any factual disputes regarding Fair & Yeager's handling of Peter's request to add William to the policy.

For the reasons that follow, we reverse and remand to the Superior Court. We conclude that unless a provision in the insurance policy or a renewal application requires the insured to notify the insurer of particular changes, the insured is under no duty to identify changes that are material and notify the insurer of such changes. Absent such a duty, the insured's silence, even if it increases a risk of loss to the insurer, is not a "misrepresentation" within the meaning of G. L. c. 175, § 186. On the record before us, there remains a disputed factual issue whether communications from Fair & Yeager at renewal amounted to a request for information that renders Peter's failure to notify of Quisset's dissolution a misrepresentation of a matter that increased the risk of loss to the insurer.

2. *The factual predicate.* We view the facts and reasonable inferences in the light most favorable to Quisset and the Sennes, the parties against whom summary judgment was granted. See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983); *Northrup* v. *Brigham*, 63 Mass. App. Ct. 362, 366-367 (2005). "As to materiality, the substantive law identifies which facts are material." *Carey* v. *New England Organ Bank*, 446 Mass. 270, 278 (2006), quoting from *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Peter founded Quisset, a New York corporation, in 1980. At all times, he was its President and sole corporate officer. On November 15, 1993, Peter applied to Quincy for a commercial automobile insurance policy to cover a 1991 Volvo sedan registered to Quisset. At that time, Quisset was an active corporation engaged in property management, and was one of Peter's businesses. Peter used the Volvo for business purposes, and he and his wife used it occasionally for nonbusiness purposes.

The application was submitted to Quincy by Fair & Yeager and was accurate in all material respects. Quincy issued a commercial automobile insurance policy with combined single limits optional bodily injury coverage of $500,000 for the policy

to obtain the coverage requested by Peter or to notify him of its unavailability.

period from November 29, 1993, to November 29, 1994. The policy listed as named insured "Quisset Properties, Inc. c/o Peter Senne Box 1542 Bassetts Island Pocasset MA."[8] The policy listed Peter and his wife as operators of the vehicle.

For the next nine years, Quincy renewed the policy annually, and the required annual premium was paid. Upon renewal, neither Quincy nor Fair & Yeager sent Quisset or Peter a renewal application or questionnaire to be completed by the insured that requested notification of changes or other information regarding Quisset or its operations.[9] At or about the time of each policy renewal, Peter did receive from Fair & Yeager a new policy declarations page together with a cover letter. Typically, the letter (1) thanked Peter for his business; (2) detailed the annual premium payable to Quincy; (3) noted that "[T]he policy contains specific insuring agreements, limits of liability, exclusions, limitations and warranties. Please read your policy carefully noting any special limitations and deductibles applicable to losses"; and (4) stated that "[i]n the event of a loss or if there is any change in conditions existing at the time this policy was written, please notify our office."

Some time in 1996 Peter stopped conducting the property management business through Quisset and began to do so per-

---

[8]The parties agree that as originally issued, and as renewed yearly thereafter, the policy contained no provision requiring Quisset to notify Quincy or Fair & Yeager of any changes, material or otherwise. Nor did the policy (as issued or renewed) contain any representation or warranty that the insured agreed to notify the insurer of any changes, material or otherwise.

The policy in effect at the time of the accident tracked the statute, stating:

"Except with respect to coverages you are required to purchase in order to register your auto in Massachusetts, we may refuse to pay claims if any oral or written misrepresentation or warranty made in the negotiation of this policy by you, or on your behalf, was made with an actual intent to deceive or if the matter misrepresented or warranted increased the risk of loss."

[9]In January, 2003, Quincy did send to Fair & Yeager, but not to Quisset, a document labelled "Important" and entitled "Massachusetts Commercial Auto Renewal Notice." The notice contained a "Commercial Automobile renewal questionnaire" for the insured that purported to enable the insurer to "properly underwrite and rate" the renewal. Among the questions posed were "the insured's employer identification number/Federal identification number"; its garaging location; and a description of the insured's operation. Handwritten on the notice is a request for information as to "how vehicle is utilized in insured's operation"; and for William Senne's current driver's license number and his percentage of use.

sonally.[10] He also ceased making required corporate filings for Quisset with New York authorities. In 1997 or 1998, Peter received a notice that Quisset would be dissolved, and on December 29, 1999, Quisset was dissolved by the Secretary of State of New York. Notwithstanding Quisset's dissolution, title and registration to the Volvo remained in the name of Quisset, and Peter continued to use the Volvo for his same business purposes. Quisset continued to have an open bank account. Out of "inertia," Peter did not notify either Quincy or Fair & Yeager that Quisset had been dissolved, either immediately or at any of the subsequent renewals of the policy for the Volvo.[11]

In 2000, on request from Peter, Quincy increased the optional bodily injury coverage under the policy to $1,000,000. Late in 2001, after William turned seventeen years old and obtained a driver's license, Peter asked Millie Koulopoulos, an employee of Fair & Yeager, whether William should be listed on the policy as an operator of the Volvo.[12] Peter had done business with Fair & Yeager since 1979 and relied on it to recommend and procure coverage for his personal and business insurance needs. He made clear to Koulopoulos that he had another car for his use and that William's use of the Volvo would be more than occasional. Koulopoulos told Peter that listing William as an operator was not necessary because a commercial policy covered the Volvo.

In May of 2002, Fair & Yeager advised Peter that William should be listed as an operator if he was using the car "more than occasionally." Peter informed Koulopoulos that William used the car more than occasionally and should be added to the policy, but for reasons that remain unclear, William was not added immediately as a listed operator.

On December 7, 2002, William was involved in a minor accident while driving the Volvo. On December 12, 2002, Fair and Yeager requested that Quincy add William as a listed opera-

---

[10]Peter owned other corporations.

[11]In December of 1998, during a conversation with Arthur Fair, Peter told Fair that Quisset still owned real property. In fact, Quisset had sold the property to another entity owned by Peter some time that year.

[12]Koulopoulos was a customer service representative with twenty years' experience.

tor under the policy. Fair & Yeager made a second request on January 3, 2003. In response, Quincy inquired of Fair & Yeager as to William's driving duties for Quisset, his approximate percentage of use of the vehicle, and whether he was also listed on Peter's personal automobile policy. See note 8, *supra.* Quincy repeated this request to Fair & Yeager on January 17, February 20, March 31, and June 11, 2003.[13]

After the last communication, Kouloupoulos notified Quincy, "I have responded to this twice before. He runs errands and uses vehicles about 25% of the time."[14] Before providing this information, Kouloupoulos never communicated Quincy's request to Peter or inquired of him regarding William's driving duties or percentage use of the vehicle on behalf of Quisset.[15] Had Peter been asked by Fair & Yeager or Quincy about Quisset or about William's use of the Volvo, he would have told them that Quisset was inactive, that William did not use the car on Quisset's business, and that William used the car seventy percent or more of the time. Peter believed that the corporate automobile rate was higher than that for personal policies.

4. *Discussion.* The narrow question before us is whether Peter's failure to notify Quincy of Quisset's dissolution represents a material misrepresentation that increased the risk of loss to the insurer within the meaning of G. L. c. 175, § 186. The motion judge's conclusion that it did springs from the threshold premise that Peter had the duty to inform Quincy of Quisset's dissolution and that his silence amounted to a "misrepresentation."[16] We disagree with the judge's threshold allocation of duty and corresponding conclusion that Peter's silence amounts to a "misrepresentation."

Peter does not dispute that he was required to provide ac-

---

[13]On or before January 17, 2003, Quincy added William to the policy. Thus, at the time of the Englehardt accident William was a named operator of the Volvo.

[14]At her deposition, Kouloupoulos denied receiving any of the first three inquiries from Quincy.

[15]She also did not respond to whether William was listed on Peter's personal auto policy.

[16]Under this view, Peter's "misrepresentation" renders the policy void regardless of who was operating the Volvo at the time of the Englehardt accident.

curate information in the original application for insurance and inform Quincy of any material changes that occurred between the time of the application and the inception of the policy. See *Chicago Ins. Co.* v. *Lappin*, 58 Mass. App. Ct. 769, 780 (2003) (applicant has duty to inform insurer of changes prior to inception of policy that render initial representations untrue). He also does not dispute that Quincy could have insisted on updated information at each yearly renewal of the policy, and that upon inquiry as to changes, he would have been obliged to answer honestly and accurately. However, he contends that where the policy did not impose such an obligation, and where neither Quincy nor Fair & Yeager requested such information nor conditioned renewal upon completion of an application or questionnaire, he was under no obligation to identify the matters that the insurer might deem material and notify it of such changes. Contrast *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 60 (1995) (insured's failure to disclose in renewal application that location of insured vehicle had changed concerned the calculation of risk at the time the renewal application was submitted).[17]

Whether Peter's silence amounts to a misrepresentation turns on whether the obligation is one of inquiry by the insurer or sua sponte disclosure by the insured when neither a policy provision nor a renewal application or questionnaire requires such information of an insured. Does an insurer have a duty to identify and ask its insured for information that it deems material (relevant to the risks being underwritten during the period of insurance or renewal)? Or does the insured have a duty to identify what is material and notify the insurer of such changes from prior policy periods?

We conclude that, when neither a policy provision nor a renewal application requires the insured to provide updated information to the insurer, the insured's failure to do so is not a misrepresentation within the meaning of G. L. c. 175, § 186. In such circumstances, the onus is on the insurer to identify the information that it considers material and request from the

---

[17]To the extent that Quincy had a renewal application form that inquired as to Quisset's status, Quincy communicated its inquiry only to its agent, Fair and Yeager, and not to the insured. See note 8, *supra.*

insured updated information concerning any changes. Absent such obligation or request, the insured's silence is not a misrepresentation within the meaning of the statute. See *Liquor Liab. Joint Underwriting Assn. of Mass.* v. *AIM Ins. Agency*, 55 Mass. App. Ct. 715, 722-723 (2002) (insurer had opportunity and responsibility to inquire of agent or insured respecting information in insurance binder). See also *Zurich Gen. Acc. & Liab. Ins. Co.* v. *Flickinger*, 33 F.2d 853, 856 (4th Cir. 1929) ("[I]t is well settled that statements in an application for a policy which is renewed relate to the time when the original policy was issued; and, if they were true at that time, it is no defense that they may not have been true later at the time of renewal").

We acknowledge that G. L. c. 175, § 186, itself does not speak directly to whether the burden is one of inquiry by the insurer or disclosure by the insured. However, nothing in that statute argues in favor of imposing an obligation of unsolicited disclosure on the insured, the failure of which is to be deemed a misrepresentation that could defeat coverage under the policy. In creating an affirmative defense for an insurer, the statute manifests a legislative purpose to protect insureds from forfeiture of coverage except in narrow circumstances. As pertinent here, to defeat coverage, the statute requires the insurer to prove that in the "negotiation" of the policy the insured made a "misrepresentation" of a matter that increased the risk of loss. See G. L. c. 175, § 186.[18] Those communications that are not "misrepresentations" are not within the ambit of the statute; nor are those "misrepresentations" that occur other than "in the negotiation" of the insurance policy.

In these statutory predicates, we discern no legislative intent to impose a duty on an insured to speak about matters concerning which he has not been asked by the insurer. The insurer sets the parameters of the negotiation, deciding those risks that it wishes to insure and those that it does not. Unless the insurer advises the insured of matters that are important to it in the "negotiation" of the policy, and that increase the risk of loss,

---

[18]At summary judgment, Quincy did not seek to defeat liability on the ground that Peter made a misrepresentation "with actual intent to deceive." It argued only that the "matter misrepresented" by Peter increased the risk of loss.

how is an insured to know what is important or increases the risk of loss? We doubt that the Legislature intended to make insureds de facto underwriters who risk forfeiture of coverage for failing to identify and volunteer changed circumstances that might increase the risk of loss to the insurer. The insured's silence is not a "misrepresentation" because the insurer is in the best position to ask for information that bears on its decision to insure. Likewise, at each renewal it may identify and call to the insured's attention those items that are material and for which changes should be called to its attention by way of written response.

While we are aware of no Massachusetts case on point, there is case authority elsewhere that imposes the duty to inquire on the insurer.[19] In *Patrons Mut. Ins. Co.* v. *Rideout*, 411 A.2d 673, 678-679 (Me. 1980), under analogous circumstances, the Supreme Judicial Court of Maine held that an insured had no duty to notify the insurer that her daughter had become a household member, and the failure to do so did not allow the insurer to avoid its obligations under the policy. There, as here, the policy itself did not require the insured to provide notice of changes to the insurer. *Ibid.* Similarly, subsequent to issuance the policy had been renewed twice without supplemental application or inquiry to the insured regarding changes. *Ibid.* In such circumstances, the court concluded that the insured had no duty to notify the insurer of the change and that the failure to do so did not constitute an "omission" of factual information material to the insurer's acceptance of the risk. *Ibid.*[20] "Absent a special agreement, the insured who makes particular representations in the application for insurance is not obligated to inform the insurer of changes in circumstances occurring *after issuance of the policy* which are inconsistent with the representations in the application." *Id.* at 678, citing *Preferred*

---

[19]We find unpersuasive Quincy's suggestion that *Barnstable County Ins. Co.* v. *Gale*, 425 Mass. 126, 127 (1997), or *Hanover Ins. Co.* v. *Leeds*, 42 Mass. App. Ct. 54, 55 (1997) command a different result. Each of those cases involves an insured's failure to disclose information in a renewal application.

[20]The Maine statute at issue in *Rideout* absolved the insurer of liability where the insured made "[m]isrepresentations, omissions, concealment of facts and incorrect statements" that were "material" to the "acceptance of the risk or to the hazard assumed by the insurer." *Id.* at 674 n.1, quoting from Me. Rev. St. Ann. tit. 24, § 2411 (West 1980).

*Risk Mut. Ins. Co.* v. *Hites,* 125 Ill. App. 2d 144 (1970); *Preferred Risk Mut. Ins. Co.* v. *Anderson,* 277 Minn. 342 (1967); 7 Couch, Insurance 2d § 35.98 (Supp. 1979). We agree with the decision in *Rideout* that "where [the insurer] makes no attempt to update its information prior to renewal and . . . relies on its agents to forward such information of changed circumstances, it would be inconsistent with our conclusion that the insured has no duty to report changed circumstances to hold that such a duty existed with regard to pro forma renewals of an already issued, valid policy." *Id.* at 678-679.

Recognized insurance treatises likewise speak to the appropriateness of placing the obligation of inquiry on the insurer. "[U]nless the insured is required to complete a new application, he or she has no duty of disclosure in connection with any policy renewals." Windt, Insurance Claims and Disputes § 2.28 (4th ed. 2001). See 6 Couch, Insurance § 82.3 (3d ed. 1996) ("Absent an express agreement to the contrary, the duty to disclose changes in conditions ceases once the application is approved and a policy issued, and the insured is not required to disclose any information thereafter acquired").

The relative knowledge and experience of the parties also counsels such an allocation of duty, as does the relative difficulty or ease with which the burden may be satisfied. Insureds are not in a position to recognize risk-enhancing circumstances as readily as the insurer, who can more easily identify and evaluate circumstances that are material to the decision to underwrite and insure the risk. Information not asked for is presumably deemed immaterial. See *Stipcich* v. *Metropolitan Life Ins. Co.,* 277 U.S. 311, 316 (1928). Moreover, imposing the burden of inquiry on the insurer poses no undue burden and reduces, if not eliminates, the difficult determination of what is, or is not, material to the risk of loss from the perspective of an insurer. See *National Union Fire Ins. Co. of Pittsburgh* v. *Continental Ill. Corp.,* 643 F. Supp 1434, 1442 (N.D. Ill. 1986) (insured not required to update representations in application). See also *Preferred Risk Mut. Ins. Co.* v. *Hites,* 125 Ill. App. 2d at 152 (absent inquiry by insurer, no obligation on insured to volunteer facts that might affect insurer's decision to carry the risk).

Because we conclude that the insured's silence is not a mis-

representation within the meaning of the statute absent an obligation in the policy or a request from the insurer at renewal, we reverse the judgment in favor of Quincy. We remand to the Superior Court for determination whether Fair and Yeager's annual policy renewal cover letters constitute a request that renders Peter's failure to advise of Quisset's dissolution a misrepresentation within the meaning of the statute. Likewise, there remain disputed factual issues appropriate for resolution regarding whether (1) Quincy is estopped from disclaiming liability under the policy due to the acts of its agent, Fair and Yeager, see *Kouravacilis* v. *American Fedn. of State, County and Mun. Employees,* 65 Mass. App. Ct. 521, 534 (2006) (agent's misrepresentation of matter in scope of employment binds his principal); and (2) Fair & Yeager is liable to Peter in negligence for failing to obtain appropriate insurance coverage. See *Rae* v. *Air-Speed, Inc.,* 386 Mass. 187, 192 (1982) ("Massachusetts law, in accordance with the general rule, clearly permits a potential insured . . . to recover in tort for the failure of an insurance agent to perform his duty to obtain an insurance policy"); *Bicknell, Inc.* v. *Havlin,* 9 Mass. App. Ct. 497, 500 (1980); *Martinonis* v. *Utica Natl. Ins. Group,* 65 Mass. App. Ct. 418, 421-422 (2006) (issue of fact whether insurance broker was negligent and caused insured to have insufficient liability limits under policy).

*Judgment reversed.*