79 Mass. App. Ct. 653 (2011)                 653

French King Realty Inc. *v.* Interstate Fire and Casualty Company.

FRENCH KING REALTY INC.[1] *vs.* INTERSTATE FIRE AND CASUALTY COMPANY.

No. 10-P-1165.

Franklin. March 4, 2011. - June 9, 2011.

Present: CYPHER, FECTEAU, & MILKEY, JJ.

*Fire. Insurance,* Fire, Coverage, Waiver, Unfair act or practice. *Contract,* Insurance, Indemnity. *Indemnity. Practice, Civil,* Summary judgment. *Consumer Protection Act,* Unfair or deceptive act. *Words,* "Maintain."

In a civil action seeking indemnification for a fire loss under a commercial lines insurance policy that the defendant insurer issued to the plaintiff, the judge properly granted summary judgment in favor of the defendant, where, although because the plaintiff had a fire suppression system in place, its coverage claim was not barred by a breach of a protective safeguards endorsement condition in the policy that the plaintiff "maintain" a fire suppression system, the coverage claim fell within two exclusions under the protective safeguards endorsement condition, in that the record showed clearly and conclusively that the plaintiff knew that its fire suppression system was impaired and failed to notify the insurer, and in that there were no genuine issues of fact that the plaintiff had control over the fire suppression system and failed to maintain it in complete working order [660-666]; further, there was no merit to the plaintiff's claim that the defendant had waived its right to enforce the protective safeguards endorsement exclusions [666-668], and the plaintiff failed to demonstrate that the defendant engaged in unfair or deceptive insurance practices [668].

In a civil action arising from a claim for fire loss under a commercial lines insurance policy that the defendant insurer issued to the plaintiff, the judge properly granted summary judgment in favor of the defendant on its claim for reimbursement of advance payment it had made under the policy prior to a determination of coverage, where nothing in the record indicated that the advancement was unconditional, and where coverage did not exist under the policy. [668-669]

CIVIL ACTION commenced in the Superior Court Department on September 5, 2006.

Motions for summary judgment on the claims in the complaint

---

[1]Doing business as French King Restaurant.

were heard by *Daniel A. Ford*, J.; a motion for summary judgment on the counterclaim was heard by *Bertha D. Josephson*, J., and entry of final judgment was ordered by her.

*Mark A. Tanner* for the plaintiff.

*William A. Schneider* (*Richard W. Jensen* with him) for the defendant.

FECTEAU, J. The plaintiff, French King Realty Inc. (French King or plaintiff), appeals from the allowance of two motions for summary judgment in favor of the defendant, Interstate Fire and Casualty Company (Interstate or defendant), that dismissed the plaintiff's cause of action.[2] The first Superior Court judge ruled that the defendant had no obligation to indemnify French King under the relevant policy for a fire loss because it did not properly "maintain" a certain fire suppression system required by the policy. The second Superior Court judge ruled that French King was required to return to Interstate advance payments it made under the policy. The primary issue presented requires interpretation of an endorsement to the policy that requires, as a condition to coverage, that French King "maintain" a fire suppression system, and of its two exclusions from coverage. Specifically, the defendant contends that the duty to maintain the fire suppression system included a duty to upgrade the plaintiff's dry system, which the manufacturer considered to be obsolete. The plaintiff argues to the contrary, saying that the authorized suppression system maintenance company it hired continued to service the dry system and to certify it as operational. On the motion record submitted and viewed in a light most favorable to the plaintiff, the first judge agreed with the defendant that the plaintiff failed to maintain a fire suppression system.[3] This appeal followed. We affirm, but upon grounds different than the first judge.

A. *Background.* French King owns real property and operates

---

[2]The plaintiff's complaint against the defendant, its insurer, alleged breach of contract, violations of G. L. c. 176D and c. 93A, and breach of the implied covenant of good faith and fair dealing, arising out of a fire loss that occurred on October 12, 2005. As part of its answer to the complaint, Interstate filed a counterclaim which sought restitution for funds advanced to the plaintiff and a declaration that it owed no duty of indemnity under the insurance policy. The parties filed cross motions for summary judgment.

[3]The second judge ruled on the restitution issue and ordered final judgment.

the French King Restaurant (restaurant) in Erving; at all times relevant Frank Prondecki had management responsibilities for the restaurant. A Kidde HDR 50 dry chemical fire suppression system (Kidde system) was installed in the kitchen before French King took ownership of the restaurant in 1974.[4]

On April 3, 2005, Interstate issued the commercial lines insurance policy in question to French King, effective until April 3, 2006. Relevant to the issue herein, the policy contained a protective safeguards endorsement (PSE) added to the commercial property coverage conditions, that provided, in pertinent part, that:

> "As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above [e.g., ANSUL SYSTEM OR EQUIVALENT). . . .
>
> "The following is added to the EXCLUSIONS section of . . . CAUSES OF LOSS — SPECIAL FORM[:] . . . We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> "1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or
>
> "2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order."

The defendant issued the policy pursuant to an application of insurance (application), dated March 7, 2005, submitted on behalf of the plaintiff and signed by Prondecki. In the general information section of the application the plaintiff was asked in question number 6 whether any insurer had declined coverage, or had canceled or not renewed an insurance policy in the prior three years; Prondecki answered in the affirmative, disclosing that on April 3, 2002, MassWest had done so because its "[u]nderwriting guideline required a 'wet' Ansul system." Question

---

[4]Prondecki reported that the Kidde system might have been installed as early as 1964.

number 9 asked if there were "any uncorrected fire code violations"; the application answer was, "No." In the application's property section, specifically, the additional coverages, options, restrictions, endorsements and rating information section, Prondecki stated: "Ansul System in place";[5] in a separate section of the application entitled "additional information section 'E,' " Prondecki stated that the property did not "have [any] outstanding building, sanitary, fire or other code violations which have been brought to the attention of the property owner in writing by a state, city or town inspector." Finally, Prondecki signed the application directly under the warning: "Any willful concealment or misrepresentation of material fact or circumstances hereon may void the policy. Signed under the pains and penalties of perjury."[6]

With respect to the Kidde system in place in the restaurant, Kidde Fire Systems had issued a bulletin to "All Kidde Pre-Engineered Distributors" dated February 11, 2002, advising that as of that date, Kidde Fire Systems would "no longer support the installation, inspection, service, recharge or repair of dry chemical systems protecting kitchen appliances and ventilation."[7] The bulletin further stated that approximately two years prior to the date of the bulletin issue, i.e., in 2000, Kidde Fire Systems had recommended that the dry chemical systems be upgraded to the Kidde APC wet chemical (UL300) systems, and that Kidde Fire Systems had phased out the inventory of the HDR dry chemical systems parts. According to the bulletin, "[w]hen encountering a dry chemical system protecting kitchen appliances and ventilation, the only acceptable action is to upgrade to a UL300 wet

[5]While "Ansul" appears to be a brand of fire suppression system, it appears that Prondecki used the term as a generic description of fire suppression systems.

[6]Interstate has not alleged that the plaintiff's application contained any misrepresentations of fact.

[7]The motion record reveals that, after 1994, dry chemical systems, like the one in the restaurant, did not meet new fire codes. The National Fire Protection Association required that all fire suppression systems be UL300 compliant, and there were no longer any dry chemical systems that would pass UL300 compliance for restaurants, and none were UL listed. As a result, effective February 11, 2002, Kidde Fire Systems, the manufacturer of the restaurant's fire suppression system, would no longer support, service, or perform repairs on dry chemical systems.

chemical system." Thus, as of February 11, 2002, the Kidde system present at the restaurant for the purposes of protecting the kitchen appliances could no longer be inspected, serviced, recharged, or repaired.[8]

Furthermore, the department of fire services for the Executive Office of Public Safety stated in an August 26, 2004, memorandum that in order for a fire suppression system to be in compliance with Massachusetts code (527 Code Mass. Regs. § 10.03[8]), the "system is to be installed, maintained and tested in accordance with [National Fire Protection Association] NFPA 96, 2001 edition. . . . Section 10.2.3 [of NFPA 96] requires the fire suppression system to be compliant with UL300 standard." The memorandum noted that "[d]ry chemical extinguishing systems . . . are found to be ineffective on cooking oil fires (deep fat fryers) [and that] [t]hese systems no longer have parts available by the manufacturers and in some cases have been delisted by Underwriter's Laboratories." As a result, such systems "will need to be upgraded to a UL300 compliant system."

After a semiannual inspection by Fire Pro-Tec N.E., Inc.[9] (Fire Pro-Tec), Fire Pro-Tec sent a letter dated November 14, 2003, to the "owner/manager" of the restaurant, warning that the fire suppression system at the restaurant was not in accordance with current NFPA requirements and not in accordance with the manufacturer's UL listing on the system.[10] At that time, Fire Pro-Tec provided its first estimate for installing a compliant wet fire suppression system, at a cost of $3,250. Furthermore, on or about June 10, 2004, Fire Pro-Tec also had issued a "range hood systems inspection report" regarding the restaurant, at the top of which stated, "Noncompliance." In this report, Fire Pro-Tec again advised that the fire suppression

[8]While the plaintiff does not contend that its service provider had not received this bulletin, the plaintiff does not admit it knew of its contents prior to the fire.

[9]Fire Pro-Tec was the company French King employed to maintain the Kidde system. Prondecki had a verbal agreement with Fire Pro-Tec that a technician would come and inspect the Kidde system "twice a year."

[10]While there is evidence that Fire Pro-Tec had inspected the Kidde system on August 16, 2002, and January 20, 2003, the results from the November, 2003, inspection appear to be the earliest reported in the record.

system was not UL300 listed, that certain testing was due to be performed, and that there were structural changes that were required to the system. Prondecki signed the report, acknowledging receipt of the report and, implicitly, that Fire Pro-Tec had informed him that the fire suppression system was determined to be in "Noncompliance" with the current NFPA requirements and not in accordance with the manufacturer's UL300 listing on this system. Prondecki asserts, however, that he never was informed by Fire Pro-Tec, orally or in writing, that his system was not operational and that Fire Pro-Tec did not explain the meaning of the term "noncompliance." He considered the report and estimate for system upgrades as recommendations only.

Shortly after the issuance of the insurance policy at issue, the "manager" of the restaurant again was informed by Fire Pro-Tec, in a letter dated June 23, 2005, that the fire suppression system at the restaurant was not in accordance with the current NFPA requirements or the manufacturer's UL listing on the system. According to this letter, in order to bring the Kidde system into compliance with the current standards, installation of a new automatic liquid (wet) fire suppression system was required. At that time, Fire Pro-Tec provided a second estimate at installing the wet fire suppression system, for a cost of $3,695.

Finally, in June, 2005, the building inspector of Erving advised French King that the system previously had been "red tagged"[11] as of June 10, 2004, and, as a result, he could not issue a certificate of inspection until French King had the system fixed.[12] While Prondecki claims not to have been informed previously of the presence of a "red tag" on the system, and that he did not know the meaning of a "red tag," he knew from this inspector that if he did not get the system "fixed," the restaurant would not be able to renew its liquor, food, and health licenses that were scheduled to expire in January of 2006. However, Prondecki never requested any other entity to reinspect the fire suppression system to confirm whether Fire

---

[11]In Prondecki's deposition, the terms "red tagged" and "red flagged" are used interchangeably.

[12]The advisory was entitled: "Noncompliance inspection notice" and listed, as reasons for noncompliance, that it was "not UL300 listed" and that the system was "over pressurized."

Pro-Tec was correct in issuing a "red tag" on the system. Although Prondecki had obtained replacement quotes in November of 2003 and June of 2005 for a new fire suppression system, nothing further was done with respect to the system before the fire on October 12, 2005,[13] and the system failed to function at that time.

In a letter dated February 28, 2006, French King, through counsel, made a demand, in writing, for payment under the policy. In a letter dated April 4, 2006, Interstate, also through counsel, declined, citing as reason that the plaintiff failed to comply with the PSE of the policy.

B. *Discussion.* The issue at the heart of this case is the interpretation of terms in the PSE that required French King to "maintain" the restaurant's fire suppression system as a condition to coverage, and that also included two exclusions from coverage: one required the insured to "maintain" its system in "complete working order"; the other required the insured to notify the insurer in the event that the fire suppression system was suspended or impaired.

"The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974). An appellate court reviewing a grant of summary judgment must examine its allowance de novo and from the same record as the motion judge. *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997). The record is open to "independent consideration" on appeal, and the appellate court may make its own determination from the record to decide the ultimate questions of the correctness of summary judgment. *Ibid.* This court may affirm a motion judge's ruling on any ground, even if it differs from the reason relied upon by the judge. *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993).

Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege

---

[13]From the record, it appears undisputed that the fire was caused from an ignition of the "fryalator" during an after-hours use.

specific facts establishing the existence of a genuine issue of material fact. Mass.R.Civ.P. 56(e). See *Madsen* v. *Erwin*, 395 Mass. 715, 719 (1985); *Godbout* v. *Cousens*, 396 Mass. 254, 261 (1985). The nonmoving party cannot defeat the motion for summary judgment by "rest[ing] on his or her pleadings and mere assertions of disputed facts." *LaLonde* v. *Eissner*, 405 Mass. 207, 209 (1989).

It is well settled that the "interpretation of an insurance contract is a question of law for the court." *Kelleher* v. *American Mut. Ins. Co.*, 32 Mass. App. Ct. 501, 503 (1992). "Like all contracts, insurance contracts are to be construed according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed. . . . A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146 (1982) (quotations and citations omitted). Unambiguous words in a policy must be enforced according to its terms. *Barnstable County Mut. Fire Ins. Co.* v. *Lally*, 374 Mass. 602, 605 (1978). Doubts created by any ambiguous words or provisions, however, are resolved against the insurer in order not to defeat intended coverage or diminish the protection purchased by the insured. *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 324 (1991).

An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, *Markline Co.* v. *Travelers Ins. Co.*, 384 Mass. 139, 140 (1981), while an insurer has the burden of proving the applicability of a particular exclusion, see *Hanover Ins. Co.* v. *Talhouni*, 413 Mass. 781, 785 (1992); *Great S.W. Fire Ins. Co.* v. *Hercules Bldg. & Wrecking Co.*, 35 Mass. App. Ct. 298, 302 (1993). The terms of an exclusionary clause will be upheld when "not reasonably susceptible of more than one meaning." *Mitcheson* v. *Izdepski*, 32 Mass. App. Ct. 903, 905 (1992).

1. *Requirements under the PSE.* We agree that summary judgment was proper, but for reasons different from those relied upon by the first judge.[14] As an initial matter, we agree with

---

[14]The judge's endorsement states: "The Protective Safeguard Endorsement

French King that the word "maintain," as it is used in the condition to coverage, is ambiguous and must be interpreted in a manner favorable to the plaintiff. When an insurance application is ambiguous, such that there is more than one rational interpretation of the policy language, it should be construed in favor of the party to be insured. *Hingham Mut. Fire Ins. Co.* v. *Mercurio*, 71 Mass. App. Ct. 21, 24 (2008). "However, an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." *Citation Ins. Co.* v. *Gomez*, 426 Mass. 379, 381 (1998), quoting from *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995). "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Ibid.*

Here, the word "maintain" is not defined in the PSE and is ambiguous because the term is susceptible to more than one meaning. In Breton, LLC *vs.* Graphic Arts Mut. Ins. Co., U.S. Dist. Ct., No. 1:09cv60 (E.D. Va. 2009),[15] the United States District Court for the Eastern District of Virginia interpreted language in a PSE identical to the one in this case. Cf. Five Star

---

of the insurance policy in question requires more than the mere existence of an ansul system or its equivalent in the insured's premises, as the plaintiff rather creatively suggests. Instead, it required the insured to *maintain* that system. It is undisputed that the ansul system which was present in the plaintiff's premises could not be maintained because it was obsolete and had to be upgraded to a wet fire suppression system. Therefore, it is clear that it was not 'maintained' by the plaintiff as required, as fully set forth by the defendant in its memorandum of law. The plaintiff failed to comply with a condition precedent, meaning that coverage did not exist on the date of the loss. Accordingly, this motion is *Allowed*."

[15]There is a dearth of case law in the Commonwealth interpreting this type of policy language. The court in Breton, LLC *vs.* Graphic Arts Mut. Ins. Co., *supra*, interpreted identical PSE language and the issue there appears on all fours with the case at bar. In Breton, a fire destroyed Breton's warehouse — "it appeared that a sprinkler system installed in . . . one of the damaged warehouse properties was not triggered by the fire because its water supply valve was in the 'closed' position at the time of the fire, thereby shutting off the system and rendering it inoperable." *Id.* at 1. The plaintiff in Breton contended, as French King does here, that the word "maintain" in the PSE was ambiguous.

While Breton is not binding on us, the logic of its analysis and the similarity of facts provides persuasive assistance in our review.

Hotels, LLC *vs.* Insurance Co. of Greater N.Y., U.S. Dist. Ct., No. 09-Civ.-8717 (S.D.N.Y. 2011). The Breton court determined "that the use of the word 'maintain' in the [PSE] is ambiguous" and, accordingly, it was appropriate to interpret the term against the drafter. Breton, LLC *vs.* Graphic Arts Mut. Ins. Co., *supra* at 14. In Breton, the court stated, "[T]here is a wide range of meanings of 'maintain.' For example, the American Heritage Dictionary provides seven definitions for the verb 'maintain,' from the restrictive and narrow meaning 'to keep in existence,' to 'keep in an existing state; preserve or retain,' to the broader meaning '[t]o keep in a condition of good repair or efficiency.' . . . Similarly, among the definitions included in Webster's dictionary is 'to keep in existence or continuance.' Black's Law Dictionary has a number of definitions for 'maintain,' as it relates to property, that range from 'to continue in possession of' to 'to care for (property) for purposes of general repair and upkeep.' " *Id.* at 14-15. The court found "that the narrower definition of 'maintain' is both a reasonable one and one that increases rather than denies or decreases coverage." *Id.* at 15.

Furthermore, within the PSE itself, the term "maintain" is used in two different contexts. First, as a condition, the PSE states: "[Y]ou are required to *maintain* the protective devices or services listed in the Schedule above" (emphasis supplied). Then, in the exclusions, the PSE states, "We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you: . . . Failed to *maintain* any protective safeguard listed in the Schedule above, and over which you had control, in complete working order" (emphasis supplied).

In contrast to its use in the exclusion, we consider the use of the term "maintain" in the condition to be ambiguous, as we think it is reasonably susceptible to a range of meanings — from one by which the obligation is simply to have a fire suppression system in place, to the further obligation to keep the system operational. To accept the defendant's view of the PSE condition, to "maintain" the system would require us to determine that it is capable of only one meaning, one that is something akin to "maintain in complete working order," which is a meaning at the extreme of the range of possible meanings. In the event that a policy provision is ambiguous, it must be

construed in favor of an insured. Thus, because the record shows that French King had a fire suppression system in place, its coverage claim is not barred by a breach of the PSE condition.[16]

2. *Coverage exclusions contained in the PSE.* We next turn to whether the first judge's decision to grant summary judgment can be sustained because the record establishes conclusively, against the existence of a genuine issue of fact, that either of the two exclusions apply. The PSE states that the insurer "will not pay for loss or damage caused by or resulting from fire if, prior to the fire, [the insured] . . . knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify [the insurer] of that fact," or "[f]ailed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order." In consideration of the motion record, Interstate has satisfied its burden to prove that both PSE exclusions apply to bar Interstate's liability for this loss, that no genuine issues of fact exist to the contrary, and that it is entitled to judgment as matter of law.[17]

a. *Plaintiff's knowledge of any suspension or impairment, and notification to the defendant.* The plaintiff argues that a genuine issue of fact exists whether it knew that the fire suppression system was suspended or impaired; we disagree. The record shows clearly and conclusively that its fire suppression system was impaired, that French King knew it was impaired, and that it failed to inform its insurer.

Webster's Third New International Dictionary 1131 (2002) defines "impair" as to "diminish in quantity, value, excellence, or strength." Fire Pro-Tec had informed French King on several occasions that the system was noncompliant with the manufacturer's UL listing, and that it was not in accordance with the current NFPA requirements. The last time Fire Pro-Tec had inspected the system was on June 10, 2004, sixteen months before the fire occurred, and on that date, French King and,

---

[16]Given this conclusion, the plaintiff's argument that the condition was waived by its disclosure on its application for insurance of a prior declination of coverage by another insurer requires no discussion.

[17]Our decision is not based upon the fact that the fire suppression system failed to function at the time of the fire.

specifically, Prondecki, had been informed that the system was in "Noncompliance," it was not UL300 listed, and the system was "over pressurized." Also at that last inspection Fire Pro-Tec issued to French King a "range hood systems report"; "Noncompliance" was handwritten across the top of the report and the report was signed by Prondecki, acknowledging that he had received it.

The record also contained two letters from Fire Pro-Tec, informing French King in both that "[p]ursuant to our recent inspection of your fire suppression system, we find that it is not in accordance with the current National Fire Protection Association . . . requirements or the manufacturer's U.L. listing." Each letter also "submitt[ed] for [French King's] consideration" a proposal "to bring [the] system into compliance with the current UL 300 requirements."

Thereafter, in 2005, the building inspector of Erving refused to issue a certificate of inspection to French King because the Kidde system had been "red tagged" on June 10, 2004, the date of the last service. The building inspector informed Prondecki that the certificate of inspection would not issue until the Kidde system was upgraded. Prondecki was aware that if the system was not "fixed," and if the certificate of inspection did not issue, then the restaurant would not be able to renew its liquor, food, and health licenses in January of 2006.

Even if we were to accept, in a light most favorable to the plaintiff, that prior to the building inspector's ultimatum in June, 2005, Prondecki was unaware of the significance that the Kidde system was noncompliant and "red tagged," by June of 2005, he understood that the Kidde system needed to be "fixed" and that Fire Pro-Tec had "red tagged" it and had "flunked the system." He was plainly aware of the deficiency of the restaurant's fire suppression system and the ramifications of the deficiency as it related to the restaurant's continuation in business. Twice he had contact with Fire Pro-Tec to get estimates for a system upgrade and on neither occasion did an upgrade occur. This record amply demonstrates that Prondecki kept putting off the day that French King had to upgrade the restaurant's fire suppression system until it absolutely was forced to do so. At no point, however, was the defendant informed of the status of the Kidde system.

Therefore, the record clearly shows an impairment to the system and no genuine issue as to whether French King had knowledge of the impairment; moreover, the defendant satisfactorily had shown that the plaintiff will be unable to prove otherwise. Regardless of whether French King had or did not have until January of 2006 to upgrade the Kidde system for certificate of inspection purposes, pursuant to the terms of the exclusion, French King was required to notify the defendant that the system was impaired, a requirement that indisputably was unfulfilled. The defendant is entitled to summary judgment on the basis of this exclusion.

b. *Plaintiff's control over the system and keeping it "in complete working order."* Likewise, there are no issues whether the plaintiff had control over the fire suppression system and that the plaintiff failed to maintain the system "in complete working order." French King had control over the system as it owned the property on which the system was located and had full access to the system. We disagree with French King's specific contention that the term "in complete working order" is ambiguous. See, e.g., *Schwartz & Schwartz of Va., LLC* v. *Certain Underwriters at Lloyd's, London,* 677 F. Supp. 2d 890, 910-911 (W.D. Va. 2009).

Webster's Third New International Dictionary 2635 (2002) defines "working order" as "a condition of a machine in which it functions according to its nature and purpose." On this record, French King failed to maintain the restaurant's fire suppression system in complete working order: it no longer could be serviced; it was labeled noncompliant; parts were no longer available for repair or maintenance; and the building inspector of Erving refused to issue a certificate of inspection because the Kidde system had been "red tagged" as noncompliant and needed to be upgraded. While the condition precedent may have allowed the plaintiff to continue in its naive view that it could simply maintain the status quo with regard to its fire suppression system, the PSE exclusion did not; to require an insured to "maintain" a fire suppression system "in complete working order" means that French King was required to take steps to bring it into compliance. Such a requirement did not allow French King to ignore or minimize the clear warnings provided

by its service contractor (Fire Pro-Tec) that the fire suppression system was noncompliant, i.e., it had been delisted as a system in compliance with relevant fire safety codes and that service on the system no longer could be supported. This record thus does not reveal a fire suppression system in "complete working order."[18]

Therefore, based on this record, while French King continues to assert an issue of fact over Prondecki's imperfect state of knowledge about the significance of Fire Pro-Tec's inspection of the restaurant's fire suppression system, there is no genuine issue of material fact whether the Kidde system was in "complete working order" at the time the fire occurred, as it clearly was not, and there are no facts or circumstances that the plaintiff can show to the contrary.

3. *Waiver.* French King next argues that the defendant waived its coverage defenses. This argument has no merit.

"An insurance company is obliged to provide coverage to an insured who has violated a provision of the policy if the company has waived its right to assert the policy breach as a ground for denying liability. Waiver consists of the insurer's voluntary or intentional relinquishment of a known right." *Merrimack Mut. Fire Ins. Co.* v. *Nonaka*, 414 Mass. 187, 189 (1993). "[W]hatever may be the scope of waiver in the law of insurance, it does not extend to the broadening of the coverage, so as to make the policy cover a risk not within its terms. That would require a new contract, and cannot be accomplished by waiver." *Id.* at 191, quoting from *Palumbo* v. *Metropolitan Life Ins. Co.*, 293 Mass. 35, 37-38 (1935). See Anderson, Vance on Insurance § 76, at 427 (3d ed. 1951) (insurer "cannot by a naked waiver assume a non-existent duty. Nothing less than a new agreement on con-

---

[18]As noted, *supra,* as background facts, by 2002, Kidde Fire Systems had eliminated all parts from its inventory for the HDR dry chemical systems and "Kidde Fire Systems w[ould] no longer support the installation, inspection, service, recharge or repair of dry chemical systems protecting kitchen appliances and ventilation." Thus, Fire Pro-Tec no longer could service, repair, or maintain the Kidde system. Moreover, on several occasions, Fire Pro-Tec had informed French King that the system was "not in accordance with the current National Fire Protection Association . . . requirements or the manufacturer's U.L. listing on this system." We do not impute the knowledge of Fire Pro-Tec to French King, and have determined the applicability of these exclusions solely on the knowledge and actions of French King as shown in the motion record before us.

sideration will suffice. . . . The insurer claiming an exception is in no wise contesting the contract, but merely asking that its liability be not extended beyond the express limits of the contract"); 2 Holmes & Rhodes, Holmes's Appleman on Insurance § 8.1, at 302 (2d ed. 1996) ("Generally speaking, however, the rules of waiver . . . can not be used to expand coverage that is specifically and unambiguously excluded by the policy language. . . . This position is strongly favored since to extend coverage through the use of the doctrine of waiver . . . will essentially rewrite the contract entered into by the parties").[19],[20]

Here, the issue is whether the defendant waived its right to enforce the PSE exclusions.[21] The burden of pleading and

---

[19]French King relies on the "class of waiver case [that] involves claimed misrepresentations by the insured that led the insurer to provide insurance coverage." *Merrimack Mut. Fire Ins. Co., supra* at 190, citing *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 657-658 (1975). See *Charles, Henry & Crowley Co.* v. *Home Ins. Co.*, 349 Mass. 723, 726-727 (1965). The *Vella* court "held that the policyholder had made no material misrepresentation . . . , and that, in any event, the insurer lost its right to disclaim liability 'when it [knew] the facts, [failed] to disclaim within a reasonable time, and [acted] in a way inconsistent with an intention to disclaim . . . . There, the insurer did not raise the question of its right to disclaim until one and one-half years after it had discovered the facts on which it relied." *Merrimack Mut. Fire Ins. Co., supra* at 190 n.5. Indeed, had this case solely concerned the policy conditions, French King's contention that the defendant waived coverage defenses because it knew or should have known of French King's dry fire suppression system might have more currency because its application for coverage disclosed a prior declination by another insurance carrier based on the dry system. While French King's additional statement on its application that it had an "Ansul System in place" is reasonably suggestive to an insurer that it had upgraded to a compliant system, such facts might be viewed as genuinely in conflict and material enough to withstand summary judgment.

However, this line of cases is inapplicable to the case at bar. The defendant is not justified in denying coverage to French King for having a dry fire suppression system, as French King claims; rather, the defendant's decision to exclude French King's loss from coverage for failing to inform the defendant of known suspensions or impairments, or failing to maintain the system in complete working order, are the operative decisions against which the plaintiff's waiver arguments are ineffective.

[20]See *Kirschner* v. *Process Design Assocs., Inc.*, 459 Mich. 587, 593-594 (1999) ("The application of waiver and estoppel is limited, and, usually, the doctrines will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy").

[21]Because we have determined that, based on the language of the condition

proving either satisfaction of policy obligations or waiver of them by an insurer is on the insured. *Hannuniemi* v. *Carruth*, 278 Mass. 230, 232 (1932). Even though the defendant apparently agreed to insure French King's dry fire suppression system, the defendant never waived the PSE's two exclusions (requiring French King to inform them of impairment or suspension of the system and French King's obligation to maintain the system in "complete working order"). There is no argument or evidence that the defendant waived its right to enforce either exclusion, which *"subtract* from coverage rather than grant it." *Bond Bros., Inc.* v. *Robinson*, 393 Mass. 546, 550 (1984). Therefore, given the circumstances of this case, the defendant is justified in not extending coverage to French King because French King is unable to prove that there are exceptions to the exclusions. French King's argument that the defendant waived its coverage defenses fails.

4. *General Laws c. 93A claim.* French King also argues that the first judge erred in dismissing its G. L. c. 93A claim for unfair claims handling. Given our determination that the defendant is not required to cover the fire loss that occurred on October 12, 2005, we conclude that French King's 93A claim is deficient because it fails to show that Interstate engaged in unfair or deceptive insurance practices as defined by G. L. c. 176D, § 3(9).[22]

5. *Return of advance payment.* French King next argues that it was not required to return to Interstate the advance payment made under the policy because Interstate did not reserve its rights and defenses in connection with the payment. We disagree.

---

in the PSE, French King did in fact have coverage from the defendant, the parties' arguments regarding conditions precedent and waiver of conditions no longer are applicable.

[22]To the extent that the plaintiff's c. 93A claim is based upon an alleged delay in responding to its demand, this record demonstrates that in a letter dated two days after the fire, Interstate informed French King that an investigation would begin promptly; the defendant also sent a $15,000 "advance payment" so that French King could pay for cleaning the rest of the building that held the restaurant. A letter dated January 4, 2006, indicated that French King had yet to provide "information relative to the inspections and/or servicing of the ansul system." The defendant denied coverage in a letter dated April 4, 2006. Thus, the defendant's delay in denying coverage was at least in part based upon the plaintiff's own delay in providing necessary information about the fire suppression system. The c. 93A claim correctly was dismissed.

As stated by the second judge, "[a]lthough no Massachusetts courts have directly addressed this issue, other jurisdictions have persuasively reasoned that an insurer is entitled to reimbursement for an erroneous payment when coverage does not exist under the policy and the insured was unjustly enriched and did not change position to its detriment in reliance on the payment," citing, e.g., *Lindsay Mfg. Co.* v. *Hartford Acc. & Indem. Co.*, 911 F. Supp. 1249, 1259 (D. Neb. 1995), rev'd on other grounds, 118 F.3d 1263 (8th Cir. 1997) ("[A]s a matter of policy, it would be unwise to discourage insurers from making payments, even if the payments were made in error, by refusing to permit later adjustments"). Here, two days after the fire and prior to determining coverage, the defendant advanced $15,000 to the plaintiff. There is nothing in the record that indicates that this was an unconditional advancement, especially because the defendant had not commenced investigating why the fire suppression system did not work. Furthermore, as stated, *supra*, there was evidence that the plaintiff did, in fact, know that there could be potential issues with the Kidde system. Thus, the second judge correctly determined that the defendant was entitled to reimbursement of $15,000.

*Judgment affirmed.*