# United States Court of Appeals
## For the First Circuit

No. 20-1407

IDS PROPERTY CASUALTY INSURANCE CO. D/B/A AMERIPRISE AUTO & HOME INSURANCE,

Plaintiff, Appellee,

v.

GOVERNMENT EMPLOYEES INSURANCE CO., INC.,

Defendant, Appellant,

PHILIP L. FELDBERG, CLAUDIA B. FELDBERG, DAWN FASANI-FELDBERG, K.F. a minor by and through her mother DAWN FASANI-FELDBERG, JONATHAN D. SIMMS, ALYNA PHROMSOPHA, WITHLACOOCHEE RIVER ELECTRIC COOPERATIVE, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Jeffrey H. Katzenstein, with whom Halaby Law Group, P.C. was on brief, for the Appellee.
Michael D. Schollard, with whom Ronald E. Harding and Harding Gurley, LLP, were on brief for the Appellant.

January 13, 2021

**THOMPSON**, **Circuit Judge**. An accident in Florida damaged a Toyota Highlander -- insured by the plaintiff IDS Property Casualty Insurance Co. d/b/a Ameriprise Auto & Home Insurance ("Ameriprise") -- and a Lamborghini -- insured by defendant Government Employees Insurance Company ("GEICO") -- while also injuring the driver of the Highlander. Instead of helping pay for the bulk of the personal and property damage, Ameriprise rescinded coverage, alleging that its insureds Philip and Claudia Feldberg had breached their obligations under the policy by making material misrepresentations when they renewed coverage in 2017. Ameriprise then took to federal court to certify its decision, naming GEICO and the Feldbergs, among others, as defendants.[1] The district court granted summary judgment to Ameriprise, leaving GEICO to foot a larger share of the insurance bill than it had hoped (the Lamborghini was worth over $100,000). GEICO appeals the summary judgment decision as well as the court's decision to limit discovery and to grant Ameriprise's motion for reconsideration. Finding GEICO's arguments non-starters, we affirm.

## Background

We review the summary judgment materials in the light most favorable to GEICO, the nonmoving party, "drawing all reasonable inferences in [its] favor" to sketch the factual background, while reserving some details for the discussion.

---

[1] Aside from GEICO, none of the other defendants affected by the accident have appealed.

Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 90 (1st Cir. 1996).

Although the Feldbergs are not a party to this appeal, GEICO's legal claims depend largely on how the Feldbergs handled their insurance policy, so we focus on their story and the details of Ameriprise's insurance policy in describing the factual background.

## Covering Massachusetts Snowbirds

On November 8, 2011, the Feldbergs purchased an auto insurance policy through Ameriprise in Massachusetts, which automatically renewed every year until 2018. The policy always listed Philip and Claudia Feldberg as the only customary drivers of the various vehicles covered by the policy and only described the principal place of garaging for the various vehicles as Peabody, Massachusetts.[2] Ameriprise's Massachusetts Auto Eligibility Guidelines, which the company claimed to enforce strictly, contained what an Ameriprise underwriter titled the "snowbird clause"; vehicles principally garaged in Massachusetts, but which remain at a second home for part of the year, are covered by Ameriprise so long as the vehicles spend at least half of the year in the Commonwealth. With this Massachusetts insurance policy in place, the Feldbergs would depart from their home in Peabody

_____

[2] Because Philip and Claudia Feldberg share a last name, we refer to them (and their daughter-in-law, Dawn, whom we will introduce soon) by their first names for clarity, and we mean no disrespect in doing so.

- 3 -

around December of each year, starting around 2015, for their condo in Naples, Florida where the couple stayed until late May or early June to avoid the famous (yet increasingly mild) New England winters.

The policy contained certain compulsory coverages -- including bodily injury to others,[3] personal injury protections (such as medical expenses and lost wages), bodily injury caused by an uninsured vehicle, and damage to someone else's property -- all of which Massachusetts law required Ameriprise to extend in the event of a claim. The policy also included optional coverages, including for rental vehicles and bodily injuries, above and beyond the baseline compulsory insurance.

Of particular interest to this appeal, the auto policy included several paragraphs that purported to limit Ameriprise's exposure to risk by reserving the right to cancel or rescind portions of the policy if the company discovered the Feldbergs provided "false, deceptive, misleading or incomplete information in any application or policy change request" or "were responsible for fraud or material misrepresentation when [they] applied for [their] policy or any extensions or renewal of it." (Emphases added.) Specifically, Paragraph 18 of the policy empowered Ameriprise to "refuse to pay claims under any or all of the

_____

[3] This compulsory provision applied only to accidents involving the Feldbergs' vehicles which occurred in Massachusetts, but Ameriprise agreed to provide this protection as a "gesture of good will" following the accident which sparked this lawsuit.

Optional Insurance Parts of this policy" if the Feldbergs did not accurately report "the description and the place of garaging of the vehicles to be insured, [and] the names of all . . . customary operators . . . ."[4] The "Coverage Selections Page" within the auto policy extended Paragraph 18's warning for any "changes that have occurred prior to the renewal of this policy and during the policy period." Paragraph 19[5] of the policy also gave Ameriprise "the right to adjust [the Feldbergs'] premium" for the same reasons.[6]

On September 16, 2016, Philip added a Toyota Highlander to this auto policy, under which he already covered a Toyota RAV4 and a Honda Accord. The paperwork formalizing the addition lists

_____

[4] We use the phrases "customary operator" and "customary driver" interchangeably throughout the opinion. However, the policy does not define what constitutes the primary garaging location or who constitutes a customary driver. We address the implications of this omission in Section II(A)(iii).

[5] The whole paragraph 19 reads as follows:

"If the information contained in your application changes before this policy expires, we have the right to adjust your premium to reflect such changes. You must inform us of any changes which may have a material effect on your insurance coverage or premium charges, including the description, ownership, type of usage and place of garaging of your auto and the household members and individuals who customarily operate your auto."

[6] Also at issue was Ameriprise's decision to rescind a personal umbrella policy, which, like the auto policy, started in November 2011 and renewed every year, and which provided Philip with additional optional coverages up to $1 million. Because the umbrella policy has similar contractual language as the auto policy regarding the consequences of withholding information, we will only refer to the general policy even though our decision affirming Ameriprise's ability to rescind coverage reaches both.

Peabody as the Highlander's principal place of garaging and identifies only Philip and Claudia as its customary drivers.

## Massachusetts Renewals in the Florida Sun

The Feldbergs received an annual renewal notice from Ameriprise on September 23, 2017, which included a cover letter enclosing the "Massachusetts Renewal Form." The letter instructed the Feldbergs that they "only need[ed] to return [the renewal form] if the information" contained within "has changed" and it more precisely guided the Feldbergs to "[p]lease review the Coverage Selections Page." The enclosed Coverage Selections Page for the Highlander, as well as for the RAV4 and Accord, listed Peabody as the principal place of garaging and recognized only Philip and Claudia as the customary drivers.

The renewal forms (one for the RAV4 and Accord, and one for the Highlander) built upon the cover letter and reiterated the theme of the initial auto policy: "It will not be necessary to return this form to your agent or company representative unless you wish to make any changes or unless the information contained on the Coverage Selections Page and in this form," including the principal place of garaging and the customary drivers, "is inaccurate or obsolete." The form instructed the Feldbergs to check the information for accuracy, and to return the form if it was incorrect, warning them that the failure to do so "may have

very serious consequences."  The Feldbergs did not return the 2017 renewal form.[7]

**Accidents in Florida + Massachusetts Insurance = Investigation**

The Feldbergs' vehicles had a rough year in 2018, enduring three incidents leading to claims with Ameriprise.  The first occurred in January when the Feldbergs' RAV4 suffered some damage in a Florida Walmart parking lot.  It was in the course of covering the claim when Ameriprise learned the Feldbergs owned a condo in Naples, Florida, however the company did not investigate the details of the Feldbergs' Florida life further because, as far as the company knew, the couple only dwelled in Florida for less than half of the year and the RAV4 returned to Massachusetts with them, conditions which satisfied Ameriprise's policy guidelines (remember, individuals who own a second home outside of the Commonwealth can be covered by Ameriprise so long as their cars stay in the Bay State for 6 months or more each year).  Ameriprise also learned from its constrained investigation that the Highlander (the added vehicle) likewise spent some time tanning in the Sunshine State.

Later, in March or April of 2018, the Feldbergs' grandson borrowed their Honda Accord in Massachusetts and promptly got into an accident within the Commonwealth's boundaries.

---

[7] The Feldbergs received the same renewal form in 2016, which they also did not return.  We limit our discussion to the 2017 renewal because its coverage began on November 8, 2017 and it was in effect at the time of the Highlander's accident.

Continuing the bad luck streak of other drivers damaging the Feldbergs' cars, a speeding Lamborghini hit their Highlander in Wesley Chapel, Florida on July 24, 2018 while their daughter-in-law, Dawn Fasani-Feldberg, was at the wheel. The crash totaled the Highlander, damaged the Lamborghini, and injured Dawn. Fault was disputed (Dawn says she got cited for a right of way violation and the Lamborghini driver got cited for speeding). The Feldbergs were not in Florida at the time of the accident, but they filed a claim with Ameriprise; meanwhile, GEICO got involved to deal with the Lamborghini. The day after the accident, Ameriprise extended five days of rental car coverage to the Feldbergs, which was an optional coverage under the policy. The company also later paid for certain medical care for Dawn's injuries as per the compulsory portions of the auto policy. The accident, however, spurred Ameriprise to investigate where the Highlander was actually garaged and who customarily drove it.

The investigation included a number of recorded calls with Philip and Dawn, as well as an examination under oath of Philip, in which both admitted key details. Philip told Ameriprise's investigator he brought the Highlander to Florida "almost immediately" after leasing it in Massachusetts and adding it to the auto policy in September 2016. Philip's kids had encouraged him to lease the Highlander so that there would be an extra car in Florida: in case Philip could not make the return drive to the frigid north due to his poor health, he could fly to

- 8 -

Florida the next winter and have the Highlander waiting for him at Dawn's house, which, in Philip's words "[was] what we did." Philip intended to drive the Highlander back to Peabody, but he never ended up feeling well enough to do so.

As for information regarding the customary drivers of the Highlander, Philip informed Ameriprise's investigator about Dawn's "standing permission . . . to use the vehicle" whenever "she needs to" for the about six or "seven months of the year" when Philip returned to the more temperate north. In furtherance of Dawn's unlimited access to the Highlander, Philip provided her with her own set of keys. Dawn estimated she drove the vehicle about "three times a week." Indeed, the car remained with Dawn the entire time the Feldbergs retired to Peabody.

### Driving the Road to Our Court

The company informed the Feldbergs on November 2, 2018 that they had violated the terms and conditions of their auto insurance policy by failing to inform Ameriprise about the Highlander's principal place of garaging in Florida and about Dawn being a customary driver. Ameriprise therefore concluded it would limit the coverage for the Highlander's July accident to the compulsory requirements and coverage for bodily injury to others (extended as a courtesy), rescinding all optional coverages and leaving GEICO to pay for the damage to the Lamborghini -- which

- 9 -

GEICO claimed was totaled -- without Ameriprise's help.[8] Ameriprise thereafter sought declaratory relief in federal district court in Massachusetts against GEICO and the other defendants, based on diversity jurisdiction, to approve the company's rescission and to confirm Ameriprise had satisfied its compulsory coverage requirements under Massachusetts law (meaning it would not have to pay for any other damages to any defendants, including damage done to the pricey Lamborghini) because of the Feldbergs' alleged material misrepresentations.

Ameriprise subsequently filed for summary judgment, attaching an affidavit from a senior underwriter, which summarized Ameriprise's baseline company policy: "[v]ehicles must be garaged at named insured's permanent residen[ce]" and vehicles are "[n]ot eligible [for coverage] if the[y are] kept outside of the state where the policy is written," as Ameriprise alleged the Feldbergs had done with the Highlander.[9] The affidavit also calculated that the Feldbergs' auto premium would have increased anywhere from $85 to $338 if the company had known Dawn was a customary driver. For his part, Philip submitted an affidavit informing the court he

---

[8] Ameriprise also refused to pay for any of the umbrella coverage, and it refused to cover the Highlander moving forward. The record is silent as to whether Ameriprise continued coverage for the other two vehicles.

[9] As a reminder, Ameriprise's Massachusetts Auto Eligibility Guidelines also contained a "snowbird clause," allowing coverage for vehicles that are principally garaged in Massachusetts but remain at a second home outside of Massachusetts for less than half of the year.

never intended to deceive or to knowingly make false statements -- he simply did not know the Highlander's principal place of garaging or how frequently Dawn drove the Highlander mattered for his coverage or his premium. Philip also asserted that even if he had given "serious thought" to the topic in November 2016 or 2017 (when the policy renewed), he would have considered the Highlander "to be garaged principally at our residence in Peabody" and that he "did not know and still [was] not sure about what constitutes a usual and customary driver of an insured vehicle" under the policy. Philip continued that he "would have taken corrective action" if someone alerted him to this erroneous belief.

GEICO opposed summary judgment for reasons following along Philip's answers; the company contended Ameriprise had not put forward sufficient evidence to prove the Feldbergs materially misrepresented the Highlander's principal place of garaging or its customary drivers, or that Ameriprise sufficiently or clearly demanded such information in the renewal form. In continuing to argue Ameriprise could not rescind the Feldbergs' coverage, GEICO, invoking principles of waiver and estoppel, alleged "Ameriprise has acted in a manner contrary to its right to" rescind "all optional coverages" because "it has voluntarily provided optional coverages" following "the July 24, 2018 Florida accident, including rental coverages and agreeing to indemnify the Feldbergs for damages up to the compulsory limits . . . ."

- 11 -

In the course of the proceeding, the district court, acting on a discovery dispute, denied in part and granted in part a protective order filed by Ameriprise, which, relevant to this appeal, prevented GEICO (and the other defendants) from discovering anything about the accident involving the Feldbergs' grandson. Later, the court initially denied Ameriprise's motion for summary judgment before reversing direction and granting it once it acted favorably upon Ameriprise's motion for reconsideration. The undisputed evidence demonstrates, the court concluded, that as a matter of law, the Feldbergs materially misrepresented the principal place of garaging and the customary drivers of the Highlander in violation of the auto policy and the renewal forms. The court also found GEICO's affirmative defenses -- that Ameriprise's behavior prohibited it from rescinding coverage -- meritless. GEICO filed a motion for reconsideration, which the district court denied, thus detouring GEICO to our appellate door.

## Discussion

GEICO raises several arguments here hoping to prevent Ameriprise from rescinding the Feldbergs' optional coverage, but they all crumbled along the way.[10] We take GEICO's contentions in the following order, grouping the first set as pre-summary judgment

---

[10] Ameriprise does not contend that it can or would rescind the compulsory coverage under Massachusetts law, only that it could do so for the optional coverage and for the umbrella policy.

decisions and the latter set as issues involving the district court's decision on summary judgment, to determine whether the district court: (1) abused its discretion by (a) preventing GEICO from conducting pretrial discovery into the accident involving the Feldberg's grandson and (b) granting Ameriprise's motion for reconsideration[11]; and (2) erred by finding that, as a matter of law, (a) the Feldbergs materially misrepresented the Highlander's principal place of garaging and its customary drivers and (b) GEICO's affirmative defenses of estoppel and waiver had no merit. And so we begin.

## I. Pre-Summary Judgment Decisions

As previewed, GEICO's first two appeals concern decisions made by the district court prior to summary judgment -- partially granting Ameriprise's protective order and granting Ameriprise's motion for reconsideration. We examine the court's decision on each topic for an abuse of discretion. See Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81 (1st Cir. 2008) (motion for reconsideration reviewed for "manifest abuse of discretion"); Ayala-Gerena, 95 F.3d at 91 ("It is well settled that the trial judge has broad discretion in ruling on pre-trial management

---

[11] GEICO's notice of appeal mentioned appealing the denial of its motion for reconsideration, but the opening brief before us only addresses the district court's decision to grant Ameriprise's motion for reconsideration. We therefore do not address the court's denial of GEICO's motion. See Vázquez-Rivera v. Figueroa, 759 F.3d 44, 46-47 (1st Cir. 2014) (arguments not raised in opening brief on appeal are waived).

matters, and we review the district court's denial of discovery for abuse of its considerable discretion.").

## A. The Secret Accident

The district court granted Ameriprise's motion for a protective order pursuant to Fed. R. Civ. P. 26(c) so as to prohibit discovery into the accident involving the Feldberg's grandson, which occurred in Massachusetts in March or April of 2018. GEICO argues the discovery order "deprived" the company "of potentially relevant information regarding [Ameriprise]'s conduct in adjusting claims brought under [the] Feldberg policy" because how Ameriprise handled the grandson's accident could have affected GEICO's affirmative defenses of waiver and estoppel. Specifically, GEICO argues the district court deprived the defendants of the chance to investigate whether Ameriprise acted consistently when it rescinded coverage for the July 2018 accident involving an "unlisted operator" based on how it handled the accident involving the Feldbergs' "unlisted" grandson. If Ameriprise treated the claims differently, GEICO postulates, then the company could either have waived its right to rescind coverage or be estopped from rescinding coverage. We will delve into the heart of these defenses later. But first, we consider whether the district court erred in its discovery ruling granting the protective order.

Although we generally favor broad discovery, we will impinge upon the district court's considerable discretion in

limiting disclosures only "upon a clear showing of manifest injustice," such that "the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Ayala-Gerena, 95 F.3d at 91 (quoting Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 186 (1st Cir. 1989)). Even if district courts provide limited or no reasoning for their orders, we allow them broad discretion to rule on discovery motions in order to design protective orders that prevent unnecessarily burdensome or problematic discovery requests. See FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000) ("Although a lower court's elucidation of its reasoning invariably eases the appellate task, motions often are decided summarily" and "we are aware of no authority that would allow us automatically to vary the standard of review depending on whether a district court has taken the time to explain its rationale."); Poliquin v. Garden Way, Inc., 989 F.2d 527, 532 (1st Cir. 1993) (explaining the need for broad discretion) (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984)).

The opposition to Ameriprise's motion for protective order argued for the right to discovery regarding "at least three [] prior insurance claims related to [the Feldbergs'] vehicles, not including the July 24, 2018 accident." The district court entered an electronic order, which only briefly concluded that it would "allow discovery . . . relating to the prior January 2018 claim" (the RAV4's incident in a Florida Walmart parking lot) and

into "damages relating to the loss which is the subject of this action" (the Highlander's July accident).[12]

Although the discovery order did not directly address the grandson's accident, it reasoned that only the January and the triggering July 2018 accidents were relevant to determine whether the Feldbergs materially misrepresented the principal place of garaging and the customary drivers of the Highlander, which impliedly meant that information about the other claims sought by GEICO, including the grandson's, were not, in the court's view, relevant to the dispute.  This tacit reasoning is sufficient for us to conclude there was no abuse of discretion, see Ogden Corp., 202 F.3d at 460, but the record contains facts which clearly informed the district court's decision.  Philip let his grandson borrow the Accord from his garage in Peabody, not from his condo in Florida, so Ameriprise had no need to explore any garaging issues related to the vehicle.  Moreover, Philip testified that his grandson was not a customary driver; the only time he ever drove Philip's car was on the day of the accident and Philip swore never to let his grandson drive one of his vehicles again.  Yes, the grandson, like Dawn, was an unlisted driver, but, as Philip testified, the grandson was not someone who, like Dawn, drove the Feldbergs' vehicle often and who had standing permission to do so.

---

[12]    The order also prohibited discovery into Ameriprise's "general policies and procedures concerning claims investigation and settlement," a decision which GEICO has not appealed.

Therefore, how Ameriprise responded to the grandson's accident does not, contrary to GEICO's assertion, necessarily bear on how the insurance company responded to an incident involving an individual like Dawn. In other words, the district court determined that how Ameriprise handled the grandson's Massachusetts-based accident had no relevance for how Ameriprise viewed the Feldbergs' material misrepresentation of the Highlander's principal place of garaging or customary drivers. After reviewing the record before us, we cannot say that the lower court's discovery order was plainly wrong or that it resulted in substantial prejudice to GEICO such that GEICO suffered a manifest injustice. See Saldana-Sanchez v. Lopez-Gerena, 256 F.3d 1, 8 (1st Cir. 2001); Ayala-Gerena, 95 F.3d at 91. Thus, we espy no abuse of discretion.

### B. Reconsidering a Motion for Reconsideration

Moving along, GEICO alludes, in a cursory two paragraphs without citations to the record, that the district court erred by allowing Ameriprise's motion for reconsideration of the court's denial of the company's motion for summary judgment because it was nothing but "a plain regurgitation of [Ameriprise's] arguments made within the [earlier] summary judgment motion. . . ." Putting aside our authority to disregard such perfunctory appellate claims, we disagree. See, e.g., Charles v. Rice, 28 F.3d 1312, 1319 (1st Cir. 1994).

Where the district court believes with good reason that it based its initial decision on an "error of law," or if its ruling "patently misunderstood a party" or misapprehended the question before it, we will not disturb the court's discretion to allow a motion for reconsideration. Ruiz Rivera, 521 F.3d at 82. And this is precisely what happened here. Initially, the district court denied Ameriprise's motion for summary judgment, finding "factual disputes over whether material misrepresentations were made to" Ameriprise "and, if so, whether such misrepresentations" were material. After considering Ameriprise's motion for reconsideration, which argued "the Defendants' opposition filings make clear that the undisputed material facts warrant summary judgment in Ameriprise's favor," the district court reversed course and explained why it had changed its mind. It granted the motion for reconsideration because it had, "[a]fter further review of the record and the pleadings, . . . conclude[d] that its denial of Ameriprise's motion [for reconsideration] was in error." Therefore, regardless of whether Ameriprise's motion for reconsideration "regurgitated" its motion for summary judgment[13] we analyze the district court's revamped reasoning in granting the motion. Because the district court articulated that it had

---

[13] For the record, the motion for reconsideration did no such thing. Ameriprise responded to the arguments put forward in opposition to summary judgment, and marshalled some of the evidence submitted in opposition, including the Feldbergs' own statement of facts, to demonstrate why the court erred initially.

misapprehended the facts and (inadvertently) made a manifest error of law, there was no abuse of discretion.  See Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted).  Now onto the next stretch of GEICO's claims.

## II. Appeals from Summary Judgment

The district court denied GEICO's remaining claims by ruling against the company on summary judgment based on Massachusetts law, and GEICO takes issue.[14]  The particular path (or legal posture, as we say) demands that we investigate the district court's decision in a specific, well-trodden manner known as de novo review, where we start from scratch with the record and legal arguments, see Norton v. Rodrigues, 955 F.3d 176, 183 (1st Cir. 2020), examining the facts in the light most favorable to and granting all reasonable inferences for the nonmovant (GEICO), see Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).  We will affirm a grant of summary judgment where "we are satisfied that there is no genuine issue of material fact" and the non-moving party (Ameriprise) "is entitled to judgment as a matter of law."  Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d

---

[14]  In a case brought to us on diversity jurisdiction, we frame the standard of review relying on federal law, while resolving the legal questions based on the law of the state whose law governs the dispute.  See Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 38 (1st Cir. 2015).  Neither party contests that Massachusetts law controls whether Ameriprise had authority to rescind.  See Dumont v. Reily Foods Co., 934 F.3d 35, 40 (1st Cir. 2019) (sitting in diversity jurisdiction, "we look to state law, as articulated by the Supreme Judicial Court of Massachusetts, for the substantive rules of decision").

- 19 -

33, 37-38 (1st Cir. 2015). To overcome the summary judgment roadblock, GEICO therefore must illustrate specific evidence "to demonstrate that a trialworthy issue exists" such "that a reasonable factfinder could resolve the [disputed] point in favor of" GEICO, possibly "affect[ing] the outcome of the suit under the applicable law." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). GEICO cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). On to the relevant law.

## A. Driving Home a Duty to Inform

The dispute compresses to a simple premise. If the renewal form sent by Ameriprise created a duty on the Feldbergs to inform Ameriprise about updates to the Highlander's principal place of garaging and customary drivers, and if the Feldbergs failed to do so, then they would have committed a material misrepresentation sufficient for Ameriprise to rescind coverage according to Massachusetts law (at least so long as GEICO failed to present any viable affirmative defenses, to which our journey arrives next). GEICO contends there are sufficient and genuine factual disputes such that the jury must decide whether Ameriprise should have covered the Feldbergs (meaning Ameriprise would have to pick up some of the tab for the Lamborghini and its driver that racked up from the July accident because the Feldbergs had no such duty to inform as claimed nor did they materially misrepresent

- 20 -

anything).  To assemble our conclusion, we follow a roadmap that takes us first through the applicable Massachusetts law, then to the language of the renewal form (which incorporated the original auto policy) to see if the form imposed a duty to inform upon the Feldbergs, and finally to see if any dispute of material fact exists in the record about whether the Feldbergs breached their duty.

### i. Whether Massachusetts law creates a duty to inform

Massachusetts General Law ch. 175 § 186 codified the common law rule that if an "insured makes a material misrepresentation during the application or renewal period for an insurance policy, the insurer may be able to deny [or rescind] coverage on that basis." Commerce Ins. Co. v. Gentile, 36 N.E.3d 1243, 1246 (Mass. 2015) (per curiam); Barnstable Cty. Ins. Co. v. Gale, 680 N.E.2d 42, 44 (Mass. 1997) (recognizing § 186 "is declaratory of long-standing common law principles defining the sort of false representations that can serve to avoid an insurance policy"); see also Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 33-34 (1st Cir. 2007) (describing insurance companies' right to rescind under § 186).  Timing is key because a misrepresentation may become material during "the negotiation of a policy of insurance."  Mass. Gen. Laws ch. 175, § 186.[15]  So, we must

---

[15]  The full pertinent provision reads as follows:

No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or

- 21 -

determine whether the renewal forms sent by Ameriprise to the Feldbergs constituted a negotiation under § 186.

The Supreme Judicial Court of Massachusetts has settled that initial policy applications and certain renewal applications -- those where an insurance company will not renew the policy without the insured returning the form -- qualify as negotiations under § 186. See Commerce, 36 N.E.3d at 1246 (citing Barnstable Cty Ins. Co., 680 N.E.2d at 44). It is also clear that so-called "ministerial renewals" -- those where the insurer sends a pro-forma letter to insureds informing them of the pending renewal that will occur without the insureds doing anything -- fall outside of the negotiation definition. See Quincy Mut. Fire Ins. Co. v. Quisset Props., Inc., 866 N.E.2d 966, 968 (Mass. App. Ct. 2007). GEICO contends the renewal applications sent by Ameriprise fall into the latter bucket because Ameriprise renewed the auto policy yearly without the Feldbergs returning the renewal form; and, since the unclear renewal letter allowed the Feldbergs to continue their policy without reporting anything, GEICO argues the Feldbergs had no duty to inform. For its part, Ameriprise maintains that its renewal form fell within the first bucket because the company clearly required the Feldbergs to report specific information

---

avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

Mass. Gen. Laws ch. 175, § 186(a).

- 22 -

about the Highlander's principal place of garaging and its customary drivers, thereby creating a duty to inform about any relevant material changes from the last policy term. To place Ameriprise's renewal form in its proper category, we, as the parties do, look to Quincy and cases interpreting its characterization of Massachusetts insurance law before turning to the language within the renewal form. See Blevio v. Aetna Cas. & Sur. Co., 39 F.3d 1, 3 (1st Cir. 1994) (binding us to "intermediate appellate state court decisions construing state law unless we are convinced that the highest court of the state would decide otherwise.").

Contrary to how GEICO interprets Quincy, the case is clear that not every automatic policy renewal letter is a ministerial renewal which would not qualify as a negotiation under § 186. If the insurer "requires the insured to provide updated information to the insurer" and if the insurer identifies with specificity "the information that it considers material and request[s] from the insured updated information concerning any changes," then the policy renewal letter is a policy renewal application that qualifies as a negotiation under § 186. Quincy, 866 N.E.2d at 971. On the other hand, where the insurer provides no such specific request, there is "no duty to identify changes that are material," id. at 968, and the "insured's silence is not a misrepresentation within the meaning of" § 186, id. at 971. The insurer therefore "sets the parameters of the negotiation" by

- 23 -

"advis[ing] the insured of matters that are important to it." Id. at 972. In other words, if the insurer solicits certain information at the renewal, it creates a duty to inform about that information because the renewal form constitutes a negotiation and any nondisclosures by the insured pertinent to that request constitute a material misrepresentation within § 186 such that the insurer could rescind coverage after the insurance policy has taken effect. See id.; see also Commerce Ins. Co. v. Gentile, 5 N.E.3d 960, 965-66 (Mass. App. Ct. 2014) (summarizing Quincy), aff'd on other grounds, Commerce, 36 N.E.3d at 1246; 6 Plitt, Maldonado, Rogers, & Plitt, Couch on Ins. § 81:21 (3d ed. Dec. 2020 update) (silence does not constitute "concealment" without a specific inquiry by the insurer). Therefore, to determine if Ameriprise's policy renewal form falls into the category of negotiation and imposes a duty to inform upon the Feldbergs, we must look to the language of the renewal form.

### ii. Whether the renewal form created a duty to inform

Because § 186 asks whether a material misrepresentation occurred during the negotiation of a policy (aka before both parties had agreed to its terms), we must, according to Massachusetts's rules of construction, "examine and interpret the relevant [renewal form] language," as a matter of law, prior to addressing the alleged misrepresentation so that we can "identify

the [appropriate] information sought" by Ameriprise.[16]  Schultz v.

Tilley, 76 N.E.3d 1051, 1054 (Mass. App. Ct. 2017) (applying rules

of construction for insurance policies to insurance applications

---

[16] Ameriprise urges us to affirm summary judgment because the Feldbergs had a continuing duty to inform the company of material changes throughout the policy period, and not solely at the renewal.  The Massachusetts Supreme Judicial Court has yet to resolve whether insureds have such a duty.  See Commerce, 36 N.E.3d at 1246  ("We leave for another day the issue whether the duty of continuing representation applies within the coverage period.").  We also need not reach the question considering that we conclude the Feldbergs had a duty to inform at the 2017 renewal stage.

However, we pause to address a related argument by GEICO, which contends that the proper response by Ameriprise to learning about the Highlander's principal place of garaging and its customary driver would not have been to rescind coverage, but to increase the premium as allowed under paragraph 19 of the original auto policy.  This argument is premised on GEICO's assertion that the Feldbergs' policy in 2018 was the same one as existed when Philip added the Highlander on September 16, 2016; without a continuing duty to inform of changes once coverage begins, as GEICO contends, the district court could not have found the Feldbergs materially misrepresented anything given their knowledge and intent as of the initial 2016 policy application.  This argument hydroplanes into a snowbank.  For one, Ameriprise renewed the policy yearly on November 8 for a one year term, as indicated on the coverage selections page.  Even if the policy provided the same substantive coverage, a new policy came into effect each year.  Therefore, the initial representations by the Feldbergs mattered only as a baseline for what Ameriprise proposed the renewed policy would cover, terms which the company would negotiate depending on whether the Feldbergs reported any material changes.  And, to hammer home our point, paragraph 19 of the auto policy allows Ameriprise to alter premiums based on changes "before th[e] policy expires" (i.e. during the coverage period).  As noted, this dispute involves material misrepresentations made on the renewal form after each year-long policy expired, meaning paragraph 19 does GEICO no good.  For another, Ameriprise would not have simply increased the premium after learning about the Highlander's Florida domain because its policy guidelines prohibit Ameriprise from covering a vehicle principally garaged in another state.

and interpreting language as a matter of law) (quoting Hingham Mut. Fire Ins. Co. v. Mercurio, 878 N.E.2d 946, 949 (Mass. App. Ct. 2008)); see Performance Trans., Inc. v. Gen. Star Indem. Co., No. 20-1022, 2020 WL 7414202, at *3 (1st Cir. Dec. 18, 2020) (applying Massachusetts rules of interpretation to examination of insurance policy). We must pay careful attention to the presence of ambiguities in the language Ameriprise used on the renewal form to request the information, because an answer (or lack of an answer) to an ambiguous question on an insurance renewal form, one that "lends itself to more than one reasonable interpretation[,] . . . cannot be labeled a misrepresentation." Mercurio, 878 N.E.2d at 949. To determine whether an ambiguity exists, we look at the "fair meaning of the language used." Schultz, 76 N.E.3d at 1054 (quoting Winbrook Commc'n Servs., Inc. v. U.S. Liab. Ins. Co., 52 N.E.3d 195, 201 (Mass. App. Ct. 2016)); see also Vicor Corp. v. Vigilant Ins. Co., 674 F.3d 1, 11 (1st Cir. 2012) (applying Massachusetts law to interpret insurance policy language as "plainly expressed").

We both read the language and resolve any ambiguity by interpreting the renewal form as a reasonable insured would comprehend it. See Dorchester Mut. Ins. Co. v. Krusell, 150 N.E.3d 731, 738 (Mass. 2020); Bos. Gas Co. v. Century Indem. Co., 910 N.E.2d 290, 305 (Mass. 2009). A term of an insurance contract is ambiguous under Massachusetts law if "reasonably intelligent persons would differ" over the language's correct meaning,

- 26 -

Dorchester Mut. Ins. Co., 150 N.E.3d at 738 (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)), and the "policy language is susceptible to more than one rational interpretation," Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012) (applying Massachusetts law) (quoting Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Co., 220 F.3d 1, 4-5 (1st Cir. 2000)). With the rules of the road laid out, let's look to the insurance renewal form sent by Ameriprise.

Ameriprise used language as precise as a GPS tracker: it told the Feldbergs to report any changes to the Highlander's principal place of garaging and to its customary drivers.[17] Unlike the ministerial renewal form in Quincy, which generically asked the insured to check whether any information contained within the policy had changed (and to notify the insurer if so), 866 N.E.2d at 969, the renewal forms sent by Ameriprise mirrored and incorporated the initial auto policy in specifying the importance of accurate information concerning the Highlander's principal place of garaging and customary drivers. The renewal

---

[17] GEICO mistakenly applies a rule of Massachusetts contractual interpretation that courts resolve ambiguities in insurance contracts in favor of the insured because of the power differential between the insurance company and the individual. See Boston Gas Co., 910 N.E.2d at 305 ("Any ambiguities in the language of an insurance contract are interpreted against the insurer who used them and in favor of the insured.") (quoting Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007)). That rule, however, does not apply to circumstances where, like here, the contract language is ineluctably unambiguous. See Metro. Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 671 (Mass. 2011).

form's cover letter instructed the Feldbergs to "review the Coverage Selections Page," which listed Peabody, Massachusetts as the Highlander's principal place of garaging and the Feldbergs as the vehicle's only customary drivers for "any application." (Emphasis added.) The renewal form, in turn, required the Feldbergs to return it only if "the information contained on the Coverage Selections Page and in this form . . . is inaccurate or obsolete" and stated that the Feldbergs "must inform [Ameriprise] of any changes which may have a material effect on [the Feldbergs'] insurance coverage or premium charges, including" the Highlander's principal place of garaging and customary operators. In several other places on the renewal form, Ameriprise drove this message home with language warning the Feldbergs of the risks of nondisclosure, specifically that Ameriprise could rescind optional coverages if the couple did not comply with Ameriprise's reporting requirements outlined in the renewal letter.

Because Ameriprise solicited this specific information from the Feldbergs as unambiguously stated in the renewal form, the renewal form was a negotiation under § 186 as a matter of law, thus establishing a duty upon the Feldbergs to inform Ameriprise about, at the very least, the Highlander's principal place of garaging and its customary drivers before Ameriprise automatically renewed their policy, a duty to which the Feldbergs admittedly did not conform. See Schultz, 76 N.E.3d at 1054-55 (no ambiguity where

- 28 -

language susceptible to only one interpretation); Cf. Quincy, 866 N.E.2d at 968.

### iii. Whether the Feldbergs breached their duty to inform

Citing to Hanover Ins. Co. v. Leeds, 674 N.E. 2d 1091 (Mass. App. Ct. 1997), RLI Ins. Co. v. Santos, 746 F. Supp. 2d 255 (D. Mass. 2010), and Progressive Direct Ins. Co. v. Martin, 425 F. Supp. 3d 48 (D. Mass. 2019), GEICO's briefing acknowledges that information about vehicle garaging and customary drivers is ordinarily material information which must be disclosed during insurance contract negotiation, and the failure to do so triggers an insurer's rescission rights.[18] See also Mercurio, 878 N.E.2d at 949 ("A material misrepresentation in an application for an insurance policy will give the insurer the right to rescind it.") (citing Barnstable Cty Ins. Co., 680 N.E.2d at 44); cf. Christy v. Travelers Indem. Co. of Am., 810 F.3d 1220, 1227 (10th Cir. 2016)

---

[18] "A 'material fact' is one which would 'naturally influence the judgment of [an] underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium.'" Leeds, 674 N.E.2d at 1094 (quoting Emp'rs' Liab. Assur. Corp. v. Vella, 321 N.E.2d 910, 913 (Mass. 1975)); see also Fed. Ins. Co., 480 F.3d at 34 (material fact one which would "naturally influence" underwriter). An Ameriprise underwriter stated during a deposition that the company would not have covered the Highlander if it knew the principal place of garaging was in Florida, and that Ameriprise would have increased the Feldbergs' premium if it knew Dawn was a customary driver because such activity increased the risk of loss to Ameriprise. See Mass. Gen. Laws ch. 175 § 186 (information deemed material if it would increase the risk of loss); Commerce, 5 N.E.3d at 965 ("If knowledge of a fact would naturally influence the judgment of the underwriter in the formation of the contract at all, or in the estimation of the character or degree of risk, or in the calculation of the premium, the fact is material.").

(assessing whether insurance renewal contract imposed affirmative duty upon insured to inform insurer about changes in business form).

But GEICO rolls out an argument as to why nondisclosure here should not trigger Ameriprise's legal right to rescind coverage of the Feldbergs' policy which boils down to this. The Feldbergs could not have misrepresented the Highlander's principal place of garaging and its customary drivers because they either did not intend to misinform or they did not know that the circumstances of the Highlander's time in Florida fell within any duty imposed by the renewal form.[19] We are not persuaded.

First, § 186 allows insurance companies to rescind coverage for any material misrepresentation which increased the insurer's risk of loss, no matter if the insured intended to deceive or knew they were deceiving the insurer. See Mass. Gen. Laws ch. 175, § 186; Progressive Direct Ins. Co., 425 F. Supp. 3d at 53 ("an insurer may void a policy even if the policyholder made an innocent misrepresentation of material fact if the disclosure

---

[19] GEICO also argues that it would be impossible for the Feldbergs to have materially misrepresented the principal place of garaging and customary drivers of the Highlander in 2016 when they initiated the policy because Philip intended to return the Highlander to Peabody for more than half the year at that time. The argument fails the driver's test because the Feldbergs renewed the auto policy in 2017 when they had updated information about the principal place of garaging and customary drivers. Philip's intent in 2016 (or 2017 for that matter) does not affect the facts at the time of renewal in 2017.

of the truth would have affected the insurer's decision in fixing the rate of premium") (internal quotation marks and citations omitted); Leeds, 674 N.E.2d at 1094 ("A misrepresentation in an application for insurance will enable the insurer to avoid the policy if the misrepresentation was made with actual intent to deceive, or [if] it is material."). Therefore, even if Philip may have believed he garaged the Highlander at his primary residence in Peabody, his claims of nescience are irrelevant. Plus, having reviewed Philip's recorded phone calls with Ameriprise and his examination under oath (not to mention the rest of the record), color us skeptical. After adding the Highlander to his policy in September 2016, Philip "almost immediately" moved it to Florida and the undisputed evidence proves the vehicle never returned to Massachusetts before the July 2018 accident. It also does not matter if Philip intended, as he claims, to eventually return the Highlander to Massachusetts once his health improved; the vehicle, as the Feldbergs were aware, remained constantly garaged in Florida at the time the Feldbergs opted not to send back the renewal form to Ameriprise in September 2017. Cf. Vaiarella v. Hanover Ins. Co., 567 N.E.2d 916, 920 (Mass. 1991) (intentions to move in with son did not mean mother was a member of son's household for purposes of insurance claim).

As to the customary driver nondisclosure, the record makes clear Philip parked the Highlander at Dawn's house for the months he and Claudia returned to Massachusetts, leaving Dawn a

- 31 -

set of keys and permitting her to drive the vehicle as she pleased, which Dawn admitted to doing about three times a week. As for the plea of definitional naivete, although the auto policy did not define customary operator and the Feldbergs never expressly stated they knew Dawn was a customary driver, a reasonable insured would interpret the renewal form's phrase "customary operators" to include drivers, like Dawn, who drove an insured vehicle at least three times a week for the more than half the year the Feldbergs resided in Massachusetts. See Boston Gas Co., 910 N.E.2d at 305.

The undisputed facts therefore lead us to only one conclusion; the Feldbergs misrepresented information, which was material, regardless of whether the Feldbergs did so intentionally. And absent the successful application of one of GEICO's affirmative defenses, Ameriprise could, as the district court found, rescind the Feldbergs' coverage as a matter of law after the policy took effect because the misrepresentation breached the Feldbergs' duty under § 186.[20] See Christy, 810 F.3d at 1230-31 (nondisclosing party must know or have reason to know

_____

[20] GEICO also alleges the district court drew impermissible factual inferences in favor of Ameriprise because, according to GEICO, there was no evidence the Feldbergs knew Dawn was a customary driver or that they intended to deceive Ameriprise concerning the principal place of garaging, at least as of 2016 when they added the Highlander to the policy. GEICO's arguments provide imprecise direction at best. As outlined, the district court in its ruling merely restated the undisputed facts; it drew no inferences, let alone impermissible ones in favor of the moving party about material facts. See Theriault, 890 F.3d at 348.

nondisclosure will affect insurer's decision making) (citing Quincy, 866 N.E.2d at 968-74).

## B. GEICO Attempts to Change Lanes (Affirmative Defenses)

In Massachusetts, GEICO can only rest its claims that Ameriprise's conduct "bars it from disclaiming coverage . . . either on [the affirmative defense of] estoppel or [] waiver." Merrimack Mut. Fire Ins. Co. v. Nonaka, 606 N.E.2d 904, 906 (Mass. 1993). Such defenses are legal arguments GEICO can assert to defeat Ameriprise's otherwise lawful right to rescind the Feldbergs' auto insurance after it took effect. GEICO can only succeed at blocking Ameriprise's rescission rights (and summary judgment in Ameriprise's favor) if we conclude the district court mistakenly determined GEICO put forth insufficient evidence to support its affirmative defenses. Examining the facts once more in the light most favorable to GEICO to determine whether either defense can carry the day, we find neither succeeds. See Theriault, 890 F.3d at 348.

### i. Estoppel

Estoppel is a legal term with several applications, including as an affirmative defense. See Nat'l Med. Care, Inc. v. Zigelbaum, 468 N.E.2d 868, 874 (Mass. App. Ct. 1984) (citing Mass. R. Civ. P. 8(c)). GEICO relies on estoppel to mean Ameriprise made certain representations which induced the Feldbergs not to report the Highlander's principal place of garaging or to disclose Dawn as a customary driver (in other words, the Feldbergs only

breached their duty because of Ameriprise's actions). If Ameriprise's conduct indeed induced the Feldbergs "to do something different from what otherwise would have been done and which has resulted" in Ameriprise rescinding coverage, then Ameriprise would be estopped from rescinding the Feldbergs' policy. Royal-Globe Ins. Co. v. Craven, 585 N.E.2d 315, 319 (Mass. 1992); see also Kanamaru v. Holyoke Mut. Ins. Co., 892 N.E.2d 759, 766 (Mass. App. Ct. 2008) ("Estoppel is appropriate where a party can demonstrate '(1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission.'") (quoting Sullivan v. Chief Justice for Admn. & Mgmt. of the Trial Court, 858 N.E.2d 699, 711 (Mass. 2006)).

Specifically, GEICO contends that: (1) Ameriprise's renewal cover letter only directed the Feldbergs to review "coverages, deductibles[,] and benefits" without mention of the principal place of garaging or the customary operators; and (2) Ameriprise did not "advise the Feldbergs of the potential coverage issue, or advise them that they should inform [Ameriprise] of the exact time periods they traveled to Florida or the identity of the vehicles that would be in Florida with them" following the January 2018 claim involving damage sustained by the Feldbergs' RAV4 in a Florida Walmart parking lot. The theories fail to spark the ignition.

As discussed above, the undisputed facts show Ameriprise provided plenty of notice in its renewal cover letter and renewal form that the company required the Feldbergs to check the accuracy of the policy's information regarding the Highlander's principal place of garaging and its customary drivers. See Mundy v. Lumberman's Mut. Cas. Co., 783 F.2d 21, 23 (1st Cir. 1986) ("even 'a casual reading of the mailed [insurance] material' would have given the plaintiffs adequate notice" of changed coverage limitations) (quoting Gov't Emps. Ins. Co. v. United States, 400 F.2d 172, 175 (10th Cir. 1968)); Cass v. Lord, 128 N.E. 716, 717 (Mass. 1920) ("It is of no consequence that the plaintiff did not read the policy . . . . He is bound by the contract into which he voluntarily entered."). As we earlier discussed, the renewal form was not ambiguous, as GEICO contends, so as to estop Ameriprise from rescinding based on the Feldbergs' decision not to return the 2017 renewal form with updated information about the Highlander's principal place of garaging and its customary drivers. See Vicor Corp., 674 F.3d at 11 (reading clear insurance policy language for express meaning).

Second, the record reveals no evidence from which we could determine Ameriprise failed to comply with any duty it owed the Feldbergs so as to estop the company from rescinding coverage. Generally, an insurance company in Massachusetts can rely on the representations made by the insured when providing coverage without needing to conduct independent investigations, and GEICO

- 35 -

does not clarify why Ameriprise would have had any duty to ask the Feldbergs for information about vehicles not involved with the January 2018 accident when investigating that claim. See Gen. Star Indem. Co. v. Duffy, 191 F.3d 55, 59 (1st Cir. 1999) ("Massachusetts law does not impose an affirmative obligation on an insurer to investigate and verify the accuracy of an insured's representations."). Although Ameriprise flagged the January 2018 claim as a coverage risk because it occurred in Florida where the Feldbergs owned a second home, and although the company may have learned at that time that the Highlander was in the Sunshine State and that Dawn sometimes drove it, Ameriprise ultimately closed its investigation without incident for the Feldbergs after determining the couple garaged the RAV4 at their Florida home for less than 6 months of the year, a time frame which accorded with Ameriprise's insurance policy guidelines. GEICO has not alleged any fact from which we could conclude Ameriprise's January 2018 investigation into the RAV4, which the Feldbergs properly listed as garaging in Peabody, Massachusetts, triggered either a duty to investigate whether the Feldbergs garaged the Highlander in Florida for more than half of the year, or a duty to advise the Feldbergs of a potential coverage issue Ameriprise did not think existed. Ameriprise's failure to do either therefore could not estop it from rescinding the Feldbergs' coverage.

## ii. Waiver

On the final stretch of this appellate journey, we examine a doctrine known as waiver, GEICO's second affirmative defense to the rescission of the Feldbergs' insurance policy. See Duffy, 191 F.3d at 59. Ameriprise could have waived its right to rescind coverage through an "express and affirmative act" or implicitly by "conduct . . . consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible." KACT, Inc. v. Rubin, 819 N.E. 2d 610, 616 (Mass. App. Ct. 2004) (alterations in original) (citation and internal quotation marks omitted); see also Nonaka, 606 N.E.2d at 906 ("intention to waive a ground for not providing coverage may be inferred from the circumstances"). An insurer also waives its right to rescind (or disclaim) coverage and must provide coverage despite a breach by the insured where the company "kn[ows] the facts, fail[s] to disclaim within a reasonable time, and act[s] in a way inconsistent with an intention to disclaim." French King Realty Inc. v. Interstate Fire & Cas. Co., 948 N.E.2d 1244, 1256 n.19 (Mass. App. Ct. 2011) (quoting Nonaka, 606 N.E.2d at 906 n.5). Whether waiver occurred is a heavily factual inquiry, so we peek under the hood

one more time to examine the record evidence.  See M.J.G. Props., Inc. v. Hurley, 537 N.E.2d 165, 167 (Mass. App. Ct. 1989).

GEICO alleges Ameriprise waived its right to disclaim optional coverages by providing the Feldbergs with a rental car and by paying for a limited amount of medical care.[21]

Recall, Ameriprise provided the Feldbergs with five days of rental car coverage on July 25, 2018, the day after the Highlander's accident, which predated Ameriprise's investigation of the claim.  GEICO, however, has not adduced any facts suggesting Ameriprise knew the Feldbergs had principally garaged the Highlander in Florida or that Dawn was a customary driver at the time of extending the option of a rental car.  Even though Ameriprise knew the Feldbergs brought their RAV4 to Florida for less than half of the year and that the Highlander spent some time in Florida prior to July 24, such information does not support a

---

[21]  GEICO also restructures its estoppel defenses as waiver defenses, first arguing Ameriprise waived its right to rescind because it did not "insist upon the return of a completed renewal form or application as a condition of a renewal of the policy." Next GEICO contends Ameriprise waived its right to rescind coverage because "it had specific information that the Highlander may have been garaged in Florida at least as early as January 2018, yet it took no action to investigate further or require the Feldbergs to execute a renewal application reaffirming the information within their policy."  For the same reasons as discussed for estoppel, Ameriprise has not waived its right to rescind coverage because its conduct in the renewal letter and in investigating the January 2018 claim could not possibly indicate a wish to disclaim that right.  KACT, 819 N.E.2d at 616 ("where waiver is not explicit, it must be premised on 'clear, decisive and unequivocal conduct.'" (quoting Glynn v. City of Gloucester, 401 N.E.2d 886, 892 (Mass. App. Ct. 1980)).

reasonable inference that Ameriprise knew or should have known the crucial details about the Highlander upon which the company would later rely to rescind the policy at the time that it extended optional rental car coverage. See Niagara Fire Ins. Co. v. Lowell Trucking Corp., 56 N.E.2d 28, 31 (Mass. 1944). On the record, the earliest Ameriprise could reasonably have been expected to discover the truth justifying its decision to rescind was when the company first interviewed Philip and Dawn on July 27, two days after Ameriprise extended the five days of optional rental car coverage. Because an insurance company in Massachusetts cannot waive its right to rescind by providing optional coverages before it has the "full knowledge of the circumstances attendant upon the loss . . . in question," id. at 31, as a matter of law, Ameriprise did not waive its right to rescind, whether implicitly or explicitly, by extending optional rental coverage in these circumstances, see French King Realty, 948 N.E.2d at 1256 n.19.

As for the extension of medical coverage, GEICO alleges Ameriprise "voluntarily waived its right to rescind the totality of the optional bodily injury coverages under the policy" because it acted inconsistently by tendering certain medical coverage for Dawn to the Feldbergs in a November 2, 2018 letter, while refusing to provide other optional bodily coverage. GEICO misses the finish line. In the letter, Ameriprise extended compulsory coverage as required by Massachusetts law and offered certain additional coverage as a courtesy, while simultaneously denying any optional

- 39 -

coverage.  The choice to rescind optional bodily coverage due to the Feldbergs' material misrepresentations is neither inconsistent with Ameriprise's legal requirement to provide compulsory insurance, see Mass. Gen. Laws ch. 90, §§ 34A-34R, nor is Ameriprise's decision to offer courtesy coverages inconsistent with its intent to disclaim the optional coverages, see French King Realty, 948 N.E.2d at 1256 n.19 (quoting Nonaka, 606 N.E.2d at 907 n.5.  GEICO's waiver arguments fail as a matter of law, and the district court properly granted summary judgment.  See Mason, 797 F.3d at 37-38.

## Conclusion

We have driven the length of the appellate arguments only to discover GEICO could not get its car out of park.  The district court's decision is **affirmed.**  Each side shall bear its own costs.